John W. POWELL, Plaintiff,

v.

UNITED STATES of America, DEPART-
MENT OF JUSTICE, Defendants.

No. C–82–0326–MHP.

United States District Court,
N.D. California.

May 15, 1984.

See also, D.C., 569 F.Supp. 1192.

Thomas Steel, San Francisco, Cal., for plaintiff.

Barbara Parker, Asst. U.S. Atty., San Francisco, Cal., for defendants.

## OPINION RE IN CAMERA REVIEW

PATEL, District Judge.

Plaintiff John Powell, his wife Sylvia Powell and Julian Schuman were journalists residing in China both before and after the 1949 Chinese Revolution. During the Korean War they were editors of the *China Monthly Review*, an English language journal published in China, which contained articles critical of the United States' conduct in the war. When the Powells and Schuman returned to the United States in 1953, they became victims of McCarthyism and the anti-communist zealotry then prevalent in Washington. They were subpoenaed to testify before various congressional committees, and high officials in the government called for their prosecution. In 1956 the government indicted the Powells and Schuman on charges of sedition based solely on the content of the articles they published in the *China Monthly Review*. Trial finally commenced in 1959 and ended in a mistrial a few days after the government had begun its case in chief. Immediately thereafter the government filed a superseding indictment charging the Powells and Schuman with treason, a capital offense, and sedition. Two years later, in 1961, the government dismissed this indictment.

On November 28, 1978, plaintiff filed a Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, request with the Department of Justice ("Department") for all documents pertaining to the Powell-Schuman indictment during the years 1956 to 1961. He subsequently brought suit in this court to enforce his rights under the Act. Pursuant to court order, he has now obtained the release of over two thousand pages of documents. However, the Department has withheld a large number of documents and has deleted substantial portions of those released, claiming that these records are exempt from disclosure pursuant to Exemptions 1, 5, 6, and 7 of the Act. 5 U.S.C. § 552(b)(1), (5), (6), (7).

At issue now is the validity of the Department's exemption claims. Plaintiff has moved for partial summary judgment and for *in camera* review of the documents, and the Department has cross-moved for summary judgment. The court, having carefully considered the arguments of

counsel and the papers submitted as well as the *Vaughn* indices and documents produced, grants plaintiff's motion for *in camera* inspection and denies the summary judgment motions.

Following oral argument on the motions the court ordered that the government submit the disputed documents for *in camera* review, and the government has produced them. As discussed below in more detail, the court will permit the government to submit supplementary supporting affidavits before the court engages in its *in camera* review. To guide the government the court has set forth not only its reasons for granting the request for *in camera* review, but also its views on the various exemptions at issue in this case.

## I. *In Camera Review*

■ The FOIA mandates a policy of broad disclosure of government documents. An agency may withhold a document only if the information contained in the document comes under one of the nine exemptions listed in § 552(b), which exemptions are to be construed narrowly. *FBI v. Abramson*, 456 U.S. 615, 630–31, 102 S.Ct. 2054, 2063–64, 72 L.Ed.2d 376 (1982); *Department of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976); *Church of Scientology of California v. U.S. Department of the Army*, 611 F.2d 738, 742 (9th Cir.1980). Furthermore, § 552(b) specifically provides that "[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt...." *See Church of Scientology*, 611 F.2d at 743–44.

■ The district court must review the exemptions claimed *de novo*, and the burden is on the government to establish that the exemptions are justified. *Van Bourg, Allen, Weinberg & Roger v. NLRB*, 728 F.2d 1270 at 1272 (9th Cir.1984); *Church of Scientology*, 611 F.2d at 742; *Vaughn v. Rosen*, 484 F.2d 820, 823 (D.C.Cir.1973), cert. denied, 415 U.S. 977, 94 S.Ct. 1564, 39 L.Ed.2d 873 (1974). In order to satisfy this burden, the government may not rely on

"conclusory and generalized allegations of exemptions," *Church of Scientology*, 611 F.2d at 742 (quoting *Vaughn*, 484 F.2d at 826), which preclude adversarial testing of the exemption claim and place the burden of wading through the documents on the court. Rather, it must present sufficient evidence to enable the court to make an independent assessment of the exemption claims. At a minimum, where a substantial number of documents are at issue, this will require affidavits or declarations which index each deletion and state the exemptions claimed along with a detailed description of the material withheld and justification for its withholding. *Vaughn v. Rosen*, 484 F.2d at 826–28.

■ In *Church of Scientology* the Ninth Circuit adopted the *Vaughn* analysis and went on to state that *in camera* review under § 552(a)(4)(B) is sometimes required to determine whether a document is exempt:

> If, however, the court finds the affidavits or testimony submitted too generalized to establish eligibility for an exemption, it may, in its discretion, proceed to examine the disputed documents *in camera* for a first-hand determination of their exempt status. 5 U.S.C. § 552(a)(4)(B).... Though the burden remains at all times on the government to establish exempt status, *in camera* inspection may supplement an otherwise sketchy set of affidavits. By first-hand inspection, the court may determine whether the weakness of the affidavits is a result of poor draftsmanship or a flimsy exemption claim.

611 F.2d at 742–43 (footnotes and citations omitted). *See also Pollard v. FBI*, 705 F.2d 1151, 1153–54 (9th Cir.1983) (*in camera* review appropriate where government testimony and affidavits have failed to provide sufficient basis for court's determination on exemption claim).

However, *in camera* review is not to be used as a substitute for an inadequate *Vaughn* index. The government has the burden of proving it is entitled to withhold a document. It must do so by presenting

an adequate *Vaughn* index from which eligibility for exemptions can be determined. Only where the government has made a bona fide attempt to provide a sufficient index and the claim for exemption cannot be evaluated merely from the index should the court embark upon the burdensome task of *in camera* review.

The Sixth Circuit recently reviewed the standards among the circuits for *in camera* review in *Ingle v. Department of Justice*, 698 F.2d 259, 264–67 (6th Cir.1983), and set forth four factors which should guide district courts in determining whether to engage in discretionary review: (1) the burden which *in camera* review will impose upon themselves and the appellate courts; (2) evidence of agency bad faith; (3) the strength of the public interest involved in the particular case; and (4) the request of the parties for court review of the documents. *Ingle*, 698 F.2d at 267.

Considering these factors, *in camera* review is appropriate as to some documents. With respect to others, the government's *Vaughn* index is inadequate and its inadequacy is not justified. Additional declarations or affidavits are required as set forth in Section II.

The court notes first that plaintiff has specifically requested *in camera* review. Furthermore, there is substantial public interest in the information at issue in the materials sought, as discussed further in Section II(C)(2)(c) below.

The fact that the Department's conduct has manifested a bad faith disregard for plaintiff's rights under the FOIA and for its obligation under the law [1] weighs heavily in the court's decision in the instant case.[2] The Department's response to plaintiff's FOIA request has been characterized by both substantial delay and gross inadequacy.

Plaintiff filed his first FOIA request with the Department on November 28, 1978 and on February 11, 1980, the Department informed plaintiff that he was number 109 on a first-come-first-serve list of major document request projects. Over a year later, on March 18, 1981, the Department wrote that there were still 105 requests preceding his. Projecting into the future this rate of three requests per year, plaintiff could have reasonably assumed that the Department would not comply with his request until the year 2016. In January 1982, having still received no documents, plaintiff filed the present lawsuit seeking to enjoin the Department to turn over all non-exempt documents responsive to his FOIA request.

On April 19, 1982, this court issued an order designed to prevent any further delays. Specifically, it ordered the government (within twenty working days) to release to plaintiff all documents responsive to his request and to prepare a detailed *Vaughn* index for all exemptions claimed. Yet the Department and its subdivisions, the Department of Justice Office of Legal Policy ("OLP"), the Executive Office of the United States Attorneys ("EOUSA"), and the Federal Bureau of Investigation ("FBI"), failed to comply with the court's deadline or with a stipulated thirty-day extended deadline. Not until mid-December 1982, after a motion for contempt had been filed, did the Department finally produce the bulk of the documents which it believes are responsive to plaintiff's request and are non-exempt, and various *Vaughn* indices.

Even after this extended delay, the affidavits submitted by the Department are entirely inadequate and fail to comply with this court's order or with *Vaughn*. In fact, the FBI has presented no index at all. Instead, it has placed code symbols next to each deletion in the documents. These symbols correspond to a table which de-

---

1. The court notes that it is referring to the conduct of the responsible officials at the Department, not the Assistant United States Attorney handling this case. Her conduct has been appropriate and responsible at all times.

2. It has generally been held that where there is evidence of bad faith by the agency, *in camera* review is appropriate. *See, e.g., Ingle*, 698 F.2d at 267; *Stein v. Department of Justice and FBI*, 662 F.2d 1245, 1258 (7th Cir.1981); *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C.Cir.1978).

scribes a category of information into which the deletion falls, and the affidavits of the Special Agents then supply generalized discussions of why a particular category of information is exempt. It appears that these discussions are broad enough to apply to any FOIA request, and they are in no way tied to the content of the specific deletions.

The FBI's "coded approach to the *Vaughn* index" is little better than the conclusory and generalized allegations of exemption which *Vaughn* disapproved. This system does not permit the court to make an independent assessment of the validity of the claimed exemptions, and the categories described are so broad that to uphold the exemption the court would have to assume on faith that it was properly applied. Moreover, in contrast to the usual *Vaughn* index response, the FBI has failed to describe the nature of the documents withheld and the information deleted; many of the FBI documents provided in this case are almost entirely blacked out so that it is impossible to determine the factual context in which the exemption is claimed.

For example, FBI document number 169 consists of six typewritten pages, two of which are blacked out in their entirety. The code symbols suggest that the information consists of the names, biographical data and other identifying information of persons who either are mentioned in the records but were not under investigation by the FBI or who supplied the FBI with information. The size of the deletions suggests that a significant portion of the deletions may be information about or supplied by these individuals. Without further information from the FBI, however, the court has no basis for determining whether such information is so unique to those individuals that it provides identification of them. More fundamentally, as discussed below, the FBI's system does not permit the court to balance the interests in privacy

against those of the public in disclosure as required by the claimed Exemption 7C. In this instance, the discussion on the previous pages of the document suggests that the deleted material may be information about the validity of plaintiff's charge that the United States was engaging in bacteriological warfare in Korea. Potentially, it is of great public interest. On the other hand, because the information is apparently between twenty-two and thirty-five years old, privacy interests are likely to be relatively slight.

Not only is the FBI's coding system inadequate, the agency has failed even to code over 625 pages of documents which it claims are outside the scope of plaintiff's request. The government has refused to provide a *Vaughn* index for these documents, or, in the alternative, to disclose how the FBI interprets the scope of plaintiff's request. In light of the liberality with which agencies must construe the scope of FOIA requests, discussed below, and the fact that these documents were in the Powell-Schuman file in the Department's Criminal Division and were forwarded to the FBI for FOIA review, the FBI's failure to prepare a *Vaughn* index or specifically identify the nature of the documents was unreasonable and completely inadequate to satisfy its burden of showing that the documents are unresponsive to plaintiff's request.

■ The OLP and EOUSA affidavits are also inadequate.[3] Though both agencies prepared a traditional *Vaughn* index, the allegations are generally too conclusory to support a motion for summary judgment, and it appears that many of the exemptions claimed may be unjustified or overbroad. For instance, many of the deletions are so substantial in size, in some cases exceeding ten pages, that it may well be that the Department has failed to segregate and release non-exempt factual material. *See Lamont v. Department of Justice*, 475 F.Supp. 761, 770–72 (S.D.N.Y.1979) (order-

---

**3.** The court further notes that the OLP did not even release five of the requested documents, or prepare *Vaughn* indices for them, until after the

hearing in this matter, a year after the court's order.

ing *in camera* review because of insufficiency of affidavits similar to those in the instant case). Similarly, the numbering system used in EOUSA's *Vaughn* index, in which the document numbers in the index do not directly correspond to the numbers actually placed on the documents, is an affront to the court. After the Department failed to respond to plaintiff's request for clarification, the court itself had to spend the time to discover how the document numbers correlate.[4]

In light of the Department's inexcusable delays and thoroughly inadequate responses, the court cannot but conclude that it is acting in bad faith. Furthermore, the Department's conduct reflects an intolerable sloppiness which gives the court little reason to rely on the representations it now makes. The court's review of the record suggests that the Department may have taken unjustified or overbroad exemptions. As the D.C. Circuit has noted, "[a] judge has discretion to order *in camera* inspection on the basis of an uneasiness, on a doubt he wants satisfied before he takes responsibility for a de novo determination." *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir.1978).

The final factor to be considered is the burden which *in camera* review will impose on the court. While review of the more than two thousand pages of documents in this case would impose an excessive burden on the court's resources (*see Church of Scientology*, 611 F.2d at 743; *Ingle*, 698 F.2d at 264–67), an alternative review process may be employed to spare the court much of this burden. *Ingle* offers some examples of approved procedures. *Id.* at 266. In this case the court will randomly select a manageable portion of the documents submitted for review. It will then issue an order which explains in detail the basis for its rulings on the disputed claims. Thereafter, the court will submit the remainder of the documents to a court-appointed special master for review in accordance with the analysis set forth in the court's order.

In light of the substantial burden which will be imposed upon the special master, the court now warns the Department that if it finds that the Department has claimed a substantial quantity of unjustified and overbroad exemptions, the court will order it to reimburse the special master at a rate of $150.00 per hour for his or her time in addition to the ordinary sanctions the court has available for bad faith or frivolous conduct.

## II. *Submission of Further Affidavits or Declarations*

The Department will be granted an opportunity to submit further affidavits to support its exemption claims, but the court stresses that no further opportunity for delay will be afforded. While the court sees no basis for extending the Department special treatment which other litigants do not enjoy,[5] it is aware that there may be important national security and privacy interests at stake in this litigation and that further explication by the Department will facilitate *in camera* review. Accordingly, despite its reluctance, the court will allow the Department sixty (60) days from the date of the issuance of this order to submit

---

4. EOUSA includes in its *Vaughn* index only those documents which were released with deletions. It then numbered its discussion of these documents consecutively. At the same time, on the face of the documents released, it numbered both those with and without deletions consecutively. Consequently, the numbers on the *Vaughn* index do not correspond to the numbers on the face of the documents. To correlate them, the court had to go through the documents one-by-one to determine which had been released without deletions and therefore not counted in the *Vaughn* index.

5. In *Dunaway v. Webster*, 519 F.Supp. 1059 (N.D.Cal.1981), the Department engaged in similar types of dilatory conduct. The court specifically warned the agency that it would not be accorded special treatment in the future. "The government should be on notice, however, that it is no more entitled to two or three 'bites at the apple' than any other litigant." *Id.* at 1071, quoting *Coastal State Gas Corp. v. Department of Energy*, 495 F.Supp. 1172, 1176 (D.Del.1980), *vacated on other grounds*, 644 F.2d 969 (3d Cir.1981).

more detailed descriptions and justifications for each of the claimed exemptions.

To aid the Department in determining whether to release any of the deleted records and to guide it in providing further information to the court, the court issues the following discussion setting forth the court's view of the legal requirements of the exemptions claimed and their application to the instant action.

### A. *Exemption 1: National Security*

■ Exemption 1, 5 U.S.C. § 552(b)(1), the national security exemption, protects from disclosure matters that are "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." Under the 1974 amendments to the FOIA, this court clearly has the responsibility to review *de novo* the agency's classification decision. In conducting this review the court must afford "substantial weight" to the affidavits submitted in support of the exemption. *See, e.g., Lesar v. United States Department of Justice,* 636 F.2d 472, 481 (D.C.Cir.1980); *Dunaway v. Webster,* 519 F.Supp. 1059, 1066 (N.D.Cal.1981).

### 1. *The Substantive Requirements of Executive Order 12356*

■ At the outset, the court must determine which Executive Order provides the applicable standards for purposes of these documents. Executive Order 12356, effective August 1, 1982, is the most recent Executive Order, and the agency reviewed the documents pursuant thereto. Under the prevailing view it is the Order in force when the agency finally acts that controls. Thus, the court concludes that the standards of Executive Order 12356, which are less stringent than those of the previous Executive Order, control.[6] *See Afshar v.*

---

6. The court applies the new Executive Order somewhat reluctantly as it has substantial concern that the agency may have delayed responding to plaintiffs' FOIA request in anticipation of the promulgation of the less stringent new Order. However, this argument was considered

*Department of State,* 702 F.2d 1125, 1136 (D.C.Cir.1983); *Lesar,* 636 F.2d at 480.

■ In relevant part Executive Order 12356 provides:

Sec. 1.3 Classification Categories.

(a) Information shall be considered for classification if it concerns:

. . . .

(4) intelligence activities (including special activities), or intelligence sources or methods;

(5) foreign relations or foreign activities of the United States;

. . . .

(b) Information that is determined to concern one or more of the categories in Section 1.3(a) shall be classified when an original classification authority also determines that its unauthorized disclosure, either by itself or in the context of other information, reasonably could be expected to cause damage to the national security.

(c) Unauthorized disclosure of foreign government information, the identity of a confidential foreign source, or intelligence sources or methods is presumed to cause damage to the national security.

47 Fed.Reg. 14,874, 14,876. Under Section 1.3, to be properly classified the information must not only fall within the specified categories—here, intelligence activities, sources or methods, or foreign relations or activities—but it must also be such that its disclosure could reasonably be expected to cause damage to the national security.

The parties have not addressed the question of the proper interpretation of § 1.3(c)'s presumption that disclosure of intelligence sources and methods information causes damage to the national security. After carefully considering this section in conjunction with the other provisions of the Executive Order, the court concludes that

---

and rejected in *Afshar v. Department of State,* 702 F.2d 1125, 1136–37 (D.C.Cir.1983), on the ground that the President's need to respond rapidly to national security needs must take precedence.

the section was intended to direct that special care be afforded to such information by application of a rebuttable rather than conclusive presumption. Construing the presumption language as conclusive would create a conflict with §§ 3.3(c) and 3.4(e) of the Order. Section 3.3(c) provides that the Director of the Central Intelligence Agency ("CIA") "may establish special procedures for systematic review for declassification of classified information pertaining to ... intelligence sources or methods." *Id.* at 14,879. Similarly, § 3.4(e) provides that the CIA Director "shall develop special procedures for review of information pertaining to ... intelligence sources or methods." *Id.* at 14,880. Since these provisions contemplate that intelligence sources and methods information may be declassified or not classified at all in some instances, the President must have intended § 1.3(c)'s presumption to be rebuttable.

This construction is also supported by important statutory considerations. In enacting the 1974 amendments, Congress clearly contemplated that the courts would have the authority to review executive branch determinations that documents be withheld on national security grounds. To provide that certain types of information are conclusively presumed to be exempt would reallocate the ultimate authority over exemption claims to the executive branch, raising serious questions about the provision's validity. Further, such an interpretation would be absurd when taken to its extreme. Intelligence sources and methods from one hundred years ago would still be automatically classified. Accordingly, the court rejects this interpretation.

### 2. *The Department's Burden of Proof*

 In order to show that the documents at issue or portions thereof qualify for a national security exemption the government must submit specific affidavits showing that the revelation of the particular information contained in the document could reasonably be expected to cause damage to the national security.[7] However, here the information classified is from twenty-two to thirty-five years old and concerns a highly publicized treason and sedition case which has been closed for over twenty years. These facts tend to rebut any presumption of damage to the national security and the government must address the significance of the age of the information. Special Agent Peterson's declaration is inadequate in this respect because, among other things, he fails to address the crucial questions of whether each particular intelligence source is still alive, is still functioning as a source, has already been revealed, or can possibly be identified by places, dates, capability, or other information supplied thirty years after the fact.[8]

---

**7.** Although the FBI's conclusory affidavits are not sufficient to permit the court to conduct its *de novo* review in the instant case, they may be sufficient to establish that the deleted materials fall within the categories set forth in the Executive Order. Moreover, it is even conceivable that such generalized discussions might suffice as a basis for the court's *de novo* review in certain cases.

For instance, if an FOIA request were brought concerning a contemporaneous and highly secret national security investigation, it would be clear that all sources being protected were presently active and that intelligence methods were current. If the agency had acted responsibly and in good faith in the litigation, the court might conclude that it had sufficiently met its burden of proof.

**8.** For example, FBI document number 108 consists of 19 pages almost all of which are blacked out. Most of the deletions are taken pursuant

to Exemption 1, and large portions of these fall under categories C3, C4, and C5. These categories correspond to the following types of information:

C3—"dated [sic] and/or place of a specific activity about which an intelligence source reported."

C4—"Detailed information provided by an intelligence source that could reasonably be expected to identify the source ..."

C5—"Information that reveals an intelligence source's capability."

(Decl. Peterson, 16–21).

Following the description of each category is a general discussion of how this type of information can be expected to damage the national security. This discussion alone, absent a discussion of the specific sources and activities involved, does not provide the court with the ability to conduct *de novo* review responsibly. *Id.*

**1518**

This court will not lightly substitute its judgment for that of the responsible executive official. However, granting Agent Peterson's declaration the substantial weight to which it is entitled adds little since the declaration is lacking in substance. The Department has provided the court with skimpy information to guide it in evaluating the reasonableness of continued classification. The declaration is merely a general theoretical discussion couched in technical language about the potential effect on the national security of releasing these broad categories of information. *Cf. Dunaway v. Webster*, 519 F.Supp. at 1069–70 (inadequate showing of potential damage to national security where most of the information "concerns the comings and goings of United States citizens 20 to 30 years ago," where many of the organizations spied on and considered subversive at the time are now defunct or no longer considered a security risk, where many of the individuals involved are dead, and where "there is no revelation in any of these documents of methods of investigation which would not leap to the mind of the simplest-minded intelligence agency").

**B. *Exemption 5***

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than the agency in litigation with the agency." 5 U.S.C. § 552(b)(5). The Department has deleted and withheld substantial portions of the requested documents pursuant to Exemption 5, claiming that they are protected under either the executive or deliberative process privilege or under the attorney work-product privilege. While Exemption 5 clearly protects information covered by these privileges (*see N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 154, 95 S.Ct. 1504, 1518, 44 L.Ed.2d 29 (1975); *Environ-*

*mental Protection Agency v. Mink*, 410 U.S. 73, 83–88, 93 S.Ct. 827, 834–836, 35 L.Ed.2d 119 (1973)), certain limits to these privileges are set forth below.

**1. *Deliberative Process Privilege***

 The deliberative process privilege exempts from disclosure legal and policy matters such as opinions, conclusions and recommendations of agency officials. This privilege is designed to improve the quality and efficiency of agency decision-making by ensuring that persons in advisory roles may freely and frankly express their opinions without fear of premature public scrutiny. *See Mink*, 410 U.S. at 87, 93 S.Ct. at 836; *Ryan v. Department of Justice*, 617 F.2d 781, 789–90 (D.C.Cir. 1980). However, the exemption only applies to memoranda which are pre-decisional in nature. This is because the disclosure of post-decisional memoranda does not impinge on the agency's deliberative process and thus does not affect the quality of agency decisions. *Sears*, 421 U.S. at 155, 95 S.Ct. at 1518. Congress intended "to delimit the exception as narrowly as consistent with efficient Government operations." S.Rep. No. 813, 89th Cong., 1st Sess., 9 (1965); *Mink*, 410 U.S. at 89, 93 S.Ct. at 837.

 Nor is the deliberative process privilege applicable to purely factual or investigative matters contained in agency memoranda. *See Mink*, 410 U.S. at 87–89, 93 S.Ct. at 836–837; *Weber Aircraft Corp. v. United States*, 688 F.2d 638, 643 (9th Cir.1982), *rev'd on other grounds*, —— U.S. ——, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984).[9] Since the privilege seeks to protect only the exchange of ideas and opinions on legal or policy matters, all factual material contained in deliberative memoranda must be disclosed unless so inextricably intertwined

9. *United States v. Weber Aircraft Corp.*, —— U.S. ——, 104 S.Ct. 1488, 79 L.Ed.2d 814 (1984) does not extend the deliberative process privilege to purely factual or pre-decisional memoranda. Rather, this decision holds that confidential statements obtained pursuant to an Air Force safety investigation are exempt pursuant to an entirely different privilege, the *Machin* privilege. *See Machin v. Zuckert*, 316 F.2d 336 (D.C. Cir.), *cert. denied*, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963). This privilege protects confidential statements made to air crash safety investigators and has no application to the instant case.

with the deliberative material that its disclosure would reveal the agency's deliberative process. *Id.*

One circumstance in which factual material was held exempt because it would have revealed the deliberative process was discussed in *Montrose Chemical Corp. v. Train*, 491 F.2d 63 (D.C.Cir.1974). There the court held privileged two factual summaries of a 9,200 page record prepared by high level attorneys to aid the administrator of the Environmental Protection Agency in reaching a final decision in an enormously complex adjudicatory proceeding. Noting that all of the facts contained in the summaries were in the public record, and that the summaries represented the evaluations of the administrator's highest advisors of which facts were significant enough to be brought to his attention, the court concluded that disclosing those summaries would reveal the crucial deliberative process of the agency. *Id.* at 71. The court observed that it might reach a different result if the facts contained in the summaries were not part of the public record. *Id.* This court notes that *Montrose* appears to be inapplicable to the documents involved in the instant case. Plaintiff is not seeking information which is already in the public record. Nor does it appear that the factual matters potentially contained in these documents for the most part are carefully culled fact summaries prepared to aid an adjudicatory decision.

■ Moreover, consistent with the Congressional intent that Exemption 5 be construed as narrowly as possible, factual material contained in deliberative memoranda cannot be considered to be intertwined with legal or policy matters solely on the broad theory that the very choice of which facts to present necessarily reveals the writer's viewpoint. *See Playboy Enterprises, Inc. v. Department of Justice*, 677 F.2d 931, 935 (D.C.Cir.1982) (mere fact that a person writing a factual report must select certain facts and omit others does not qualify factual report for deliberative process privilege).

### 2. *Work-Product Privilege*

■ The work-product privilege as codified in Fed.R.Civ.P. 26(b)(3) protects against disclosure "the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation" as well as documents "prepared in anticipation of litigation." At the outset, plaintiff argues that the work-product privilege is not available to the Department in the instant cases. Contending that because the Powell-Schuman prosecution has long been closed and there is no potential for further related litigation in the future and that countenancing further withholding of the requested information would little serve the purposes of the privilege, plaintiff argues that the work-product privilege should not apply, at least for purposes of Exemption 5. Plaintiff relies on *Grolier Inc. v. FTC*, 671 F.2d 553 (D.C.Cir.1982). While this decision was recently reversed in *FTC v. Grolier Inc.*, —— U.S. ——, 103 S.Ct. 2209, 76 L.Ed.2d 387 (1983), in which the Supreme Court held that the work-product privilege applies even though the litigation had terminated six years before the FOIA request was made, this court notes that *Grolier* may not be altogether applicable to the instant case.

First, plaintiff's FOIA request in the instant case arises out of a criminal proceeding rather than a civil proceeding as in *Grolier*. Therefore, it may be appropriate to consider plaintiff's FOIA request in the context of the law governing discovery in criminal proceedings which may provide greater access to certain types of documents than would the civil discovery procedures. *See* Fed.R.Crim.P. 16; *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963) (due process requires that prosecution disclose evidence favorable to the accused.) In *Grolier* the Supreme Court declared that a court should not base its determination as to whether a document is privileged on hypothetical litigation, but rather should consider whether the document would "normally" be privileged. 103 S.Ct. at 2215.

Applying this rationale, it is at least arguable that the court should consider whether the requested documents would be available in *criminal* litigation with the government, rather than whether they would be available in the context of a hypothetical civil lawsuit. The documents for which the exemption is sought were prepared in anticipation of criminal litigation, not civil litigation. There is no civil case paradigm this court can use to frame the privilege and, hence, it would have to construct one.

The applicability of *Grolier* to the instant case is also questionable in view of the fact that the criminal prosecution of the Powells and Schuman terminated more than twenty years ago in 1961 with the dismissal of the indictment. As Justices Brennan and Blackmun noted in their concurrence in *Grolier*, "the need to protect attorney work product is at its greatest when the litigation with regard to which the work product was prepared is still in progress." 103 S.Ct. at 2216. While the *Grolier* Court found it important to protect the work product of litigation which had ended a mere seven years ago, the interests in protecting the work product of the more than twenty-year-old Powell prosecution are much slighter. Moreover, where, as in this case, the only relevant litigation terminated more than twenty years ago and could not conceivably be reopened, the Court's analysis in *United States v. Weber*, ⸺ U.S. ⸺, 104 S.Ct. 1488, 1494 n. 20, 79 L.Ed.2d 814 (1984) may limit *Grolier's* proscription on considering a plaintiff's need to obtain the disputed information in determining the availability of the work-product privilege. In *Weber*, although the Court found that plaintiffs would not be permitted to obtain the desired information under the FOIA by countering the work-product privilege with a showing of need, the Court observed that plaintiffs *would* be able to make such a showing of need in the ongoing and related civil litigation. Such an alternative source is not available to Powell as the Powell prosecution was terminated long ago and could not conceivably be reopened.

The court merely raises these questions as to the complete applicability of *Grolier* to the instant case without ruling on them at the present time. If plaintiff is able to show that the disputed documents would in fact be available to him in the relevant litigation with the agency, then defendant may not withhold them pursuant to Exemption 5. The court will make this determination after it has reviewed the documents *in camera*.

▇ Assuming that the work-product privilege applies, the documents are not necessarily exempt in their entirety. The courts have consistently held that the fact-policy distinction applied to the deliberative process privilege applies to work-product materials as well, barring exemption for purely factual materials. *E.g., Mervin v. FTC*, 591 F.2d 821, 825–26 (D.C.Cir.1978) (also see Judge Bazelon's separate opinion at 831–32); *Robbins Tire and Rubber Co. v. NLRB*, 563 F.2d 724, 734–36 (5th Cir. 1977), *rev'd on other grounds*, 437 U.S. 214, 98 S.Ct. 2311, 57 L.Ed.2d 159 (1978); *Deering Milliken, Inc. v. Irving*, 548 F.2d 1131, 1138 (4th Cir.1977); and *Iglesias v. CIA*, 525 F.Supp. 547, 560 (D.D.C.1981).

▇ Nonetheless, in the context of work product, the court must be particularly sensitive to the possibility that an attorney's discussion of factual matters will reveal his or her tactical or strategic thoughts. *See Mervin*, 591 F.2d at 826–27. Accordingly, assuming that the work-product privilege generally applies to the document, only verbatim witness statements and other objective reporting of facts need be released.

Finally, the court notes that the Department may have waived the right, in whole or in part, to assert the work-product privilege. In previous releases the Department has already disclosed a good deal of work-product material. Much of this material contains frank evaluations of the crucial policy, legal and factual questions raised by the Powell-Schuman case, and most of these documents reflect positively on the Department's handling of the case. *See, e.g.*, Memorandum from Archibald Cox, Solicitor General, to J. Walter Yeagley, As-

sistant Attorney General, Internal Security Division (March 6, 1961) (Ex. D to Plaintiff's Reply Memorandum); Memorandum from Victor C. Woerheide to Thomas Hall, Chief, Criminal Division (March 27, 1959) (Ex. C to Plaintiff's Reply Memorandum.) The court is concerned that other work-product materials discussing the same or similar issues but which do not reflect as positively on the Department's conduct are being withheld. If this is the case, the court may find that the Department has waived its right to claim the privilege for these matters. To find a waiver would accord with the purposes of the FOIA since such an abusive use of Exemption 5 would be directly contrary to the Act's intent to facilitate disclosure of information which is embarrassing to agencies or evidences misconduct on their part. The parties may address this question in their supplemental submissions. Plaintiff should submit copies of all relevant work-product materials already released so the court in its *in camera* review may more fully evaluate the Department's conduct.

### C. *Exemptions 6 and 7*

Exemptions 6 and 7 provide:

(b) This section does not apply to matters that are—

(6) personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy;

(7) investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings, (B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose inves-

tigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel.

5 U.S.C. § 552(b)(6) & (7). The Department has widely asserted these exemptions throughout the documents, particularly Exemption 7. Because Exemptions 6 and 7C substantially overlap, the court will consider the two exemptions together.

### 1. *The Threshold Requirements*

Both Exemptions 6 and 7 have threshold requirements which must be met before they can be asserted.

#### a. *Exemption 6*

 Exemption 6 only applies to information contained in "personnel and medical files and similar files." The proper construction of the "similar files" language has been the subject of much debate. However, in the recent case *United States Department of State v. Washington Post Co.*, 456 U.S. 595, 102 S.Ct. 1957, 72 L.Ed.2d 358 (1982), the Supreme Court authoritatively construed this language and concluded that it is to be very broadly interpreted. According to the Court,

[w]hen disclosure of information which applies to a particular individual is sought from government records, courts must determine whether release of the information would constitute a clearly unwarranted invasion of that person's privacy.

*Id.* at 602, 102 S.Ct. at 1961. In the instant case, it appears that the agency has deleted information under Exemption 6 only where it applied to a "particular individual," thereby meeting this threshold requirement. *See Van Bourg, Allen, Weinberg & Allen v. NLRB*, 728 F.2d 1270 at 1273 (9th Cir.1984).

#### b. *Exemption 7*

The threshold requirement of Exemption 7 provides more difficulty. Exemption 7 only applies to "investigatory records compiled for law enforcement purposes." While courts have construed this requirement liberally, and accorded the agency special deference, the Ninth Circuit none-

**1522**

theless requires that "an agency with a clear law enforcement mandate such as the FBI ... establish ... a 'rational nexus' between its law enforcement duties and the document for which Exemption 7 is claimed." *Binion v. United States Department of Justice*, 695 F.2d 1189, 1194 (9th Cir.1983). *See also Church of Scientology*, 611 F.2d at 748; *Dunaway v. Webster*, 519 F.Supp. at 1076. In other words, the FBI must establish that its investigative activities are "realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached." *Pratt v. Webster*, 673 F.2d 408, 420–21 (D.C.Cir.1982). Thus the question is whether the records indicate that "the agency was gathering information with the good faith belief that the subject may violate or has violated federal law, or was merely monitoring the subject for purposes unrelated to enforcement of federal law." *Lamont v. Department of Justice*, 475 F.Supp. 761, 773 (S.D. N.Y.1979).

In the instant case, most of the records were compiled for the purposes of aiding the pending prosecution against the Powells and Schuman. Clearly, these records were compiled for law enforcement purposes. However, it appears that a substantial quantity of information was gathered regarding the various Powell-Schuman legal defense committees which were organized to support the defense and publicize the constitutional questions which were raised by the case. The court fails to see any rational nexus between this sort of general surveillance and information-gathering and the enforcement of a federal law, and the Department has not attempted to offer an explanation. After reviewing the documents, the court will determine whether there is any indication that these investigative activities were realistically based on a legitimate concern that the national security was threatened by the committees' activities. The court will also determine whether any other aspects of the FBI's investigation lacked a legitimate law enforcement purpose and thereby fail to qualify for Exemption 7.

**2. *Exemptions 6 and 7C***

**a. *The Balancing Test***

■ It is well established that when determining whether disclosing information would constitute an unwarranted invasion of personal privacy the court must balance the individual's privacy interest against the public's interest in disclosure of the government information. In *Department of Air Force v. Rose*, 425 U.S. 352, 372, 96 S.Ct. 1592, 1604, 48 L.Ed.2d 11 (1976), the Supreme Court affirmed this interpretation of Exemption 6, and the courts have uniformly applied the same principal when reviewing claims under Exemption 7C. *See, e.g., Fund for Constitutional Government v. National Archives and Records Service*, 656 F.2d 856, 862 (D.C.Cir.1981); *Lesar v. United States Department of Justice*, 636 F.2d 472, 486.

In *Church of Scientology*, 611 F.2d at 746, the Ninth Circuit set forth the appropriate standard for Exemption 6:

The case law thus identifies four factors to be balanced in weighing a claim of exemption for a "clearly unwarranted invasion of personal privacy": (1) the plaintiff's interest in disclosure; (2) the public interest in disclosure; (3) the degree of the invasion of personal privacy; and (4) the availability of any alternative means of obtaining the requested information. In weighing the factors, we keep in mind that the invasion of privacy must be "clearly" unwarranted.

*See also Van Bourg*, 728 F.2d 1270 at 1273 (9th Cir.1984) at 1490 (setting forth same factors). The Supreme Court has also repeatedly emphasized that there is significance to the different language in the two exemptions. Exemption 6's requirement of a "clearly unwarranted" invasion is more difficult for the government to meet than 7C's "unwarranted" invasion. *See FBI v. Abramson*, 456 U.S. 615, 629, 102 S.Ct. 2054, 2063, 72 L.Ed.2d 376 (1982); *Department of Air Force v. Rose*, 425 U.S. at 378–79 n. 16, 96 S.Ct. at 1607 n. 16.

**b. *The Relevance of Public Harm***

■ Through its various affiants, the Department takes the position that the

public harm which may result from disclosure of certain information is a relevant consideration in applying the balancing test of Exemptions 6 and 7C. For instance, Agent Davis avers that the names and identifying information of persons interviewed by the FBI are exempt under 7C because the FBI's "continued access to persons willing to honestly relate pertinent facts bearing upon a particular investigation outweighs any benefit plaintiff might derive from being furnished" with this information. (Third Declaration of Sherry L. Davis at 18.) Without actually addressing the propriety of so doing, some courts have weighed in the Exemption 6 and 7C balancing test the public harm which might result from the disclosure of certain evidence. *See, e.g., Miller v. Bell*, 661 F.2d 623, 631 (7th Cir.1981), *cert. denied*, 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 484 (1982) (weighing public harm to the integrity of future FBI undercover investigations in upholding deletion of FBI agents' names under 7C and considering potential harm to public confidence in integrity of FBI criminal investigations caused by disclosure of names of third parties named by interviewees in upholding 7C claims); *Lamont*, 475 F.Supp. at 782 (weighing under Exemption 6 potential harm to FBI's investigative functions if names of interviewees were disclosed).

However, the Court of Appeals for the District of Columbia has recently addressed this issue head-on and concluded that the potential public harm is not relevant to the Exemption 6 balancing analysis. *Washington Post Co. v. United States Department of Health and Human Services*, 690 F.2d 252, 260 n. 23 (D.C.Cir.1982) (risk that requiring disclosure of the financial information at issue might deter qualified scientists from becoming consultants for the National Cancer Institute held irrelevant to Exemption 6 claim though relevant to Exemption 7 claim). This court finds the

*Washington Post* court's analysis persuasive. It accords with the legislative history of both exemptions, the statutory framework, and the Supreme Court's recent analysis. *See Abramson*, 456 U.S. at 630–32, 102 S.Ct. at 2063–64.

While the legislative history of Exemption 6 clearly indicates that Congress contemplated that the courts would balance the individual's private interest against the public's interest in disclosure of government information, there is no suggestion that Congress authorized the courts to engage in wide-ranging inquiries into the possible public harms which may conceivably flow from the release of information. The House Report states:

> The limitation of a "clearly unwarranted invasion of personal privacy" provides a proper balance between the protection of an individual's right of privacy and the preservation of the public's right to Government information *by excluding those kinds of files the disclosure of which might harm the individual.*

H.R.Rep. No. 1497, 89th Cong., 2d Sess. 11, *reprinted* in [1966] U.S.Code Cong. & Admin.News 2418, 2428 (emphasis added).[10]

In *Department of Air Force v. Rose*, 425 U.S. at 372, 96 S.Ct. at 1604, after reviewing the legislative history, the Supreme Court made no mention of public harm but concluded, "Congress sought to construct an exemption that would require a balancing of the individual's right to privacy against the preservation of the basic purpose of the Freedom of Information Act 'to open agency action to the light of public scrutiny.'"

■ The legislative history of 7C demonstrates equally clearly that Congress did not contemplate that the courts would weigh the potential harm to public policy in the balance in applying that exemption. Prior to the 1974 Amendments, Exemption

---

**10.** Similarly, the Senate Report states:

> The phrase "clearly unwarranted invasion of personal privacy" enunciates a policy that will involve a balancing of interests between the protection of an individual's private affairs from unnecessary public scrutiny, and the preservation of the public's right to governmental information.

S.Rep. No. 813, 89th Cong., 1st Sess. 9 (1965); *Rose*, 425 U.S. at 372, 96 S.Ct. at 1604.

7 was interpreted as a blanket exemption for all investigatory files compiled for law enforcement purposes. To narrow its scope at the same time as protecting legitimate secrecy needs, in 1974 Congress carefully amended Exemption 7 to protect six specified categories of information contained in investigatory files. Exemption 7C is modeled after Exemption 6 and protects individual privacy rights.[11] Other exemptions, 7D and 7F, protect confidential sources and the information they provide, and the physical safety of law enforcement personnel. Exemption 7 specifically enumerates the harms to be considered. Interpreting 7C as a catchall protecting against general public harm would amount to rewriting the exemption.

Furthermore, in response to Congressional concern that the original proposed amendment would impair the FBI's ability to obtain information from informants and other members of the public for fear of public disclosure, the Conference Committee broadened 7D, not 7C. It amended 7D to protect "confidential sources" instead of "informants" and provided protection for both the identities of confidential sources and for confidential information provided only by a confidential source. *See, e.g.,* 120 Cong.Rec. 36877–78, 36871 (remarks of Senators Byrd and Hart). In contrast, 7C is never mentioned in connection with these problems. *Id.* Its purpose is solely to protect privacy interests. *Id.* at 36878.

The reasoning of a recent Supreme Court opinion confirms this court's interpretation of both Exemption 6 and 7C. In *FBI v. Abramson,* 456 U.S. at 630–32, 102 S.Ct. at 2063–64, the Court held that information originally compiled for law enforcement purposes and protected by Exemption 7 does not lose its exempt status when it is subsequently incorporated into records compiled for purposes other than law enforcement. Rejecting plaintiff's argument that even if Exemption 7 were inapplicable other exemptions would provide comparable protection, the Court reasoned that even assuming Exemption 6 provides fully comparable protection to the privacy interests guarded by 7C, no exemption other than 7 could

> *compensate for the potential disruption in the flow of information to law enforcement agencies by individuals who might be deterred from speaking because of the prospect of disclosure.*

> . . . . .

Congress thus created a scheme of categorical exclusion; it did not invite a judicial weighing of the benefits and evils of disclosure on a case-by-case basis. *Id.* at 630, 631 (emphasis added) (footnotes omitted). The Court's analysis lead to but one conclusion: Exemptions 6 and 7C were intended to provide protection for the individual's right to privacy. They were not directed at the public harms underlying the other examples or not otherwise addressed by the Act.[12]

---

**11.** Because Exemption 7C is modeled upon 6, the previous discussion regarding the legislative history of Exemption 6 is relevant to 7C as well. As originally proposed by Senator Hart, Exemption 7 would have permitted deletion of information which would constitute a "clearly unwarranted invasion of personal privacy." 20 Cong.Rec. 17033 (1974) (remarks of Sen. Hart). Senator Hart stated that the Exemption 7 privacy exception was added only to make clear that the protections provided by Exemption 6 apply to information contained in investigatory files as well. *Id.* While the Conference Committee ultimately deleted the requirement that the invasion be "clearly unwarranted" in response to President Ford's suggestion that such a strict requirement would not sufficiently protect legitimate privacy interests, there is no suggestion that this change was intended to protect non-pri-

vacy interests. 120 Cong.Rec. 33157–33159 (letters between President Ford and Sen. Kennedy).

**12.** This court's analysis is consistent with the Ninth Circuit's opinion in *Church of Scientology v. United States Department of the Army,* 611 F.2d 738 (9th Cir.1979). The detailed balancing test set forth by the *Church* court does not incorporate public harm as a relevant factor to be considered in the Exemption 6 balancing test. Moreover, although certain citations may appear to be to the contrary, close analysis reveals that they do not indicate that the court of appeals has adopted a view inconsistent with the result reached here. After reviewing the various authorities affirming the balancing test under Exemption 6, the *Church* court cited with a *"but see"* signal *Robles v. EPA,* 484 F.2d 843 (4th Cir.1973). *Id.* at 746. Like this court,

### c. *Application of the Balancing Test Under Exemption 7C*

██ In the instant case, the Department has deleted on a categorical basis the names of and identifying information regarding: FBI agents; persons under investigation by the FBI or suspected of engaging in criminal activity but not prosecuted; persons who supplied the FBI with information about the Powells or Schuman; persons who supplied the FBI with general information regarding the disputed factual issues in the case; and persons who are incidentally mentioned in the FBI files. In support of these broad exemptions the Department cites numerous cases which it contends approve the categorical deletion of this information. *See, e.g., Ingle v. Department of Justice,* 698 F.2d at 269; *Miller v. Bell,* 661 F.2d at 629–32; *Fund for Constitutional Government v. National Archives,* 656 F.2d at 862–66; *Lesar v. United States Department of Justice,* 636 F.2d at 487–88; *Nix v. United States,* 572 F.2d 998, 1005–06 (4th Cir.1978); *Dunaway v. Webster,* 519 F.Supp. at 1076–80. Close examination of these cases, however, reveals that these courts did not permit the exclusion of a category of information without reference to the specific facts of each case. Rather, some of these courts engaged in an extensive balancing analysis, weighing the asserted interests in disclosure against the recognized privacy interests. *See, e.g., Miller v. Bell,* 661 F.2d at 629–32; *Fund for Constitutional Government,* 656 F.2d at 862–66; *Dunaway v. Webster,* 519 F.Supp. at 1076–80. In other cases, the courts found that plaintiffs had offered no substantial public interest to justify disclosure. *See, e.g., Lesar,* 636 F.2d at 487–88; *Nix,* 572 F.2d at 1006 (also noting that ruling did not imply a blanket exemption for all FBI personnel). Insofar as any court has suggested that general categorical rules control rather than a balancing of interests based on the particular facts of each case this court concludes that such an approach is contrary to the purposes of the Act, the legislative history and the statutory requirement that the courts review exemption claims *de novo.* Accordingly, in the discussion below the court will outline its general approach toward balancing the interests at stake in light of the particular facts of this case.

██ The courts have consistently recognized that FBI agents have a significant privacy interest in non-disclosure of their names. *See, e.g., Miller v. Bell,* 661 F.2d at 629–30; *Lesar,* 636 F.2d at 487. The basis for this interest is that disclosure of their identities could conceivably subject them to annoyance or harassment or even physical danger in either their official or private lives. *Lesar,* 636 F.2d at 487.

██ Individuals under investigation by the FBI or associated in the FBI's files with groups or persons under investigation are also appropriate subjects for exemption under 7C. *See, e.g., Fund for Constitutional Government,* 656 F.2d at 864; *Dunaway,* 519 F.Supp. at 1078–79. Release of this kind of information may damage the individual's reputation or cause great humiliation or embarrassment.

██ Similar concerns apply to persons who supply the government with information about subjects of investigation. FBI interviewees, like FBI agents, have a privacy interest in their identities because they may be subject to harassment or annoy-

---

*Robles* rejected the argument that public harm should be considered under Exemption 6. It also held, however, that the interest of the plaintiff before the court in disclosure is irrelevant. In citing *Robles,* the *Church* court did not indicate which of these holdings it was distinguishing. Two considerations convince this court that it is more proper to conclude that the *Church* court was distinguishing *Robles* on the basis of its second holding on the relevance of the plaintiff's interest. First, in the paragraph immediately following the *Robles* citation, the court held, contrary to *Robles,* that one factor to be weighed is the plaintiff's interest in disclosure. Second, there was no allegation of public harm in that case. Finally, in reciting the holding of *Getman v. NLRB,* 450 F.2d 670 (D.C.Cir. 1971), the *Church* court stated that the court balanced, *inter alia,* the public harm from disclosure. *Id.* at 745–46. The mere recital of *Getman's* ruling, however, does not intimate that the Ninth Circuit will ultimately adopt this view. This issue was not even before the *Church* court at that time.

**1526**

ance if their identity is discovered or may suffer embarrassment and humiliation if the fact that they supplied information about an associate or friend is disclosed. *See, e.g., Kuehnert v. FBI,* 620 F.2d 662, 667 (8th Cir.1980); *Librach v. FBI,* 587 F.2d 372, 373 (8th Cir.1978), *cert. denied,* 440 U.S. 910, 99 S.Ct. 1222, 59 L.Ed.2d 459 (1979).

The privacy interests of each of these groups have, however, seriously diminished with the passage of time. Many of the persons mentioned in the documents may be deceased. Many of the agents may be dead or retired from service. Undoubtedly memories and hostile feelings, if any, have waned. There is likely to be little fear of retaliation, humiliation or embarrassment over twenty years after the events.

This case is distinct from nearly all cases where legitimate privacy interests were found. In those cases there were recent or ongoing investigations. For example, in *Kiraly v. FBI,* 728 F.2d 273 (6th Cir.1984), the plaintiff, who sought records regarding a government informant, had been convicted of conspiracy to commit aggravated murder upon the informant and was alleged to be involved in organized crime.[13] The plaintiff in *Miller v. Bell* announced that his purpose in obtaining the names of FBI agents, interviewees and third parties was to pursue civil litigation. He described himself as litigious. The court's concern that the individuals whose names were being sought might wish to avoid the plaintiff's avowed intent to draft their help with prospective anti-government litigation was given as a justification for maintaining the privacy of the agents and private citizens. 661 F.2d at 628. Similarly, the records sought in *Lesar, Fund for Constitutional Government* and *Kuehnert* involved investigations proximate in time and raised concerns about the reputations of living persons and the public identification of FBI personnel.

Far less compelling privacy interests exist when the material sought relates to events over twenty years old. This does not mean that only contemporary or recent records are entitled to exemption under 7C. Rather, each particular interest must be weighed. Whether the subject is deceased is only one consideration. Even then, all privacy interests are not surrendered. There may be legitimate concern for the reputation of the deceased and the consequences of disclosure upon his family. Again, the contemporaneity of the information is a major consideration. *See Kiraly v. FBI,* 728 F.2d at 278.

With the passage of time the likelihood of embarrassment and harassment may diminish, depending upon the nature of the material sought. The issues underlying the prosecution of the Powells and Schuman and the tenor of the times strongly suggest that some individuals may have waived their privacy interests by public involvement or disclosure. Still others may be embarrassed by their involvement or because they were subjects of investigation. Others may consider their participation a badge of honor.

Persons whose identities have been disclosed in previous FOIA releases have less of a privacy interest. Unless there is intimate undisclosed information or information of a nature completely different from that previously disclosed, the names should be released.

Deletions have also been made of names of persons associated or believed to be associated with various committees organized to support the Powell-Schuman defense. The court finds it difficult to believe that disclosure of an individual's association with these committees could significantly harm an individual's reputation some twenty-five years later. The very nature of their association suggests that they publicly acknowledged their involvement. Moreover, as explained above, there appears to be no legitimate law enforcement purpose

---

**13.** The Powells, on the other hand, were not charged with engaging in violent acts. They were prosecuted for writing articles critical of the government's conduct in Korea and, in fact, were never convicted of committing any crime.

for the investigation and compilation of this information.

The court also notes that deletions have been made for information which, while not directly naming associates or suspects, may be used to identify these individuals. It is unlikely at this time that circumstantial information would be sufficient to expose an individual's identity. In most of these instances the information will be required to be released absent a showing of a specific valid privacy interest.

The government must consider the above factors in determining what records must be disclosed and what records retain valid privacy interests. A blanket assertion of privacy involving records over twenty years old is impermissible.

The nature and extent of individual privacy interests must be weighed against the public interest in disclosure. Usually the greater the privacy interest the more compelling must be the public interest in disclosure. In weighing the public interests, it is necessary to keep in mind that it is the interest of the general public that is important and not that of a litigant. However, even though the litigant is motivated by his own personal interest that does not militate against disclosure where there is a general public interest to be served. The Powells seek disclosure for personal reasons and to write and inform.

Clearly, this is not a case of an individual motivated solely by his own interests. There is a great public concern stemming from the governmental intrusions and excesses of the McCarthy era and the subject matter which the Powells addressed and for which they were prosecuted. The Powells were charged and tried for sedition and treason based solely on the content of articles they had published which were critical of the United States' conduct in Korea. Among the criticisms leveled at the United States were allegations that it had stalled in peace negotiations, underestimated American casualties to the American public and engaged in bacteriological warfare in Korea with technology garnered from Japanese war criminals. It is axiomatic that these matters are of concern to a democratic society. The Second Circuit recently recognized that there is a valid public interest in government records and conduct of the McCarthy era, approving a diminished privacy interest in old documents and *in camera* review of material for which exemptions under 7C and 7D were sought. *Diamond v. FBI*, 707 F.2d 75 (2d Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984).

Bacteriological and chemical warfare have been the focus of international debate since World War I.[14] They continue to receive attention, most recently when the President of the United States sought to bring the issue of chemical warfare to the bargaining table in negotiations with the U.S.S.R.[15]

Furthermore, citizens of a free society have a deep concern and legitimate interest in how their government conducts its foreign affairs or investigates its citizens at home or abroad. This is especially true where it appears that those investigations may themselves impinge on First Amendment rights. While recognizing that this public interest in how government conducts its foreign affairs and undercover operations might, if taken to an extreme, threaten the viability of those operations, and while the court indicated earlier that such "public harm" may not be weighed in the Exemptions 6 and 7C calculus, other exemptions do adequately protect the continued viability of government operations. Exemption 7D protects information which would disclose the identity of a confidential source, and, to the extent matters of na-

---

14. *See, Note Establishing Violations of International Law: "Yellow Rain" and the Treaties Regulating Chemical and Biological Warfare,* 35 Stan.L.Rev. 259–95 (1983). The note contains a thorough historical review of international efforts to control the use and proliferation of chemical and biological weapons, including reference to allegations made against the United States for use of these weapons during the Korean War. *Id.* at 265.

15. N.Y. Times, Feb. 25, 1984, § 1, at 7, col. 4; N.Y. Times, Feb. 11, 1984, § 1, at 3, col. 4.

tional security are involved, the government may seek to justify withholding records under the national security exemption.

The government must spell out in greater detail in conformity with the guidelines set forth above exactly what privacy interests, if any, are still retained and how those interests outweigh the interest of the public in disclosure.

Plaintiffs have submitted an affidavit setting forth a partial list of persons associated with the case who are now deceased. The affidavit is uncontroverted by defendant. Therefore, the court assumes it is undisputed that the persons listed are no longer living. Unless the government can come forward with specific grounds why the identification of these persons should not be disclosed, the court will grant summary judgment in favor of plaintiffs on the 7C exemption claim for this category.

Plaintiffs have also submitted a list of names of persons whose identity has been disclosed in earlier FOIA releases. Again, the government must come forward and show the names were not released or, if they were released, why they are entitled to continued protection under 7C.

The Department has deleted the identities of third parties mentioned incidentally in the files. The defendant shall set forth in general terms the nature of these third parties and their relationship to the case. The court will likely uphold these deletions if the third parties are merely incidental because, although the privacy interests are minimal, the public interest in disclosure also appears to be minimal.

d. *Application of the Balancing Test Under Exemption 6*

Exemption 6 may be asserted for the same type of information for which Exemption 7C has been claimed but where Exemption 7 is inapplicable because, for instance, the threshold requirement of a law enforcement purpose has not been met. Insofar as it is asserted for this type of information, the analysis outlined for Exemption 7C will apply. The only difference is that Exemption 6 is a more narrow exemption,

and the court will accordingly review the exemptions taken with a stronger emphasis on disclosure in mind. Insofar as Exemption 6 is claimed for other matters, the court will of course apply the appropriate balancing test.

3. *Exemption 7D*

a. *The Identity of Confidential Sources*

 Exemption 7D protects information which would disclose the identity of a confidential source. The legislative history of this exemption establishes that a person given an express assurance of confidentiality is protected, and that assurance may be implied if the person provided information "in circumstances from which such an assurance could be reasonably inferred." Conf.Rep. No. 1200, 93d Cong., 2d Sess., *reprinted in* [1974] U.S.Code Cong. & Admin.News 6267, 6285, 6291. *See Nix v. United States*, 572 F.2d at 1003; *Robbins Tire*, 563 F.2d at 733.

The Department urges the court to find that all persons interviewed by the FBI receive an implied assurance of confidentiality. According to the Department, other courts have so ruled, and such·an approach is necsesssary to preserve the FBI's ability to find sources of information. It is true that some courts have. reached this or a similar result. *See, e.g., Miller v. Bell*, 661 F.2d at 627 (unless there is contrary evidence in the record, an implied promise of confidentiality is inherently implicit in FBI interviews conducted pursuant to a criminal investigation); *Ingle v. Department of Justice*, 698 F.2d at 269 (same); *Dunaway v. Webster*, 519 F.Supp. at 1081 (applying "functional" approach, *i.e.*, since the FBI's investigatory function depends upon information supplied by individuals who may suffer severe detriment if revealed, all those who supply information do so under implied assurance). However, the court finds this approach inconsistent with the requirement that the court engage in *de novo* review and the express language of the Conference Report. Under the Report, whether confidentiality has been im-

plied is a question of fact which must be determined from the surrounding circumstances, and many courts have so held. *See, e.g., Nix,* 572 F.2d at 1003–04; *Robbins Tire,* 563 F.2d at 733–34; *Deering Milliken, Inc. v. Irving,* 548 F.2d at 1137; *Iglesias v. CIA,* 525 F.Supp. at 563–64.

Recognizing that Congress was quite concerned about the need to protect confidential FBI sources and did not intend to place a heavy burden on the Agency in claiming that information was provided under an implied assurance of confidentiality, this court finds that confidentiality should be implied "when the source would hardly have supplied the information unless it were confident that its identity would remain concealed." *Iglesias,* 525 F.Supp. at 564, *citing Pope v. United States,* 599 F.2d 1383, 1386 (5th Cir.1979). In the context of a criminal investigation by the FBI it is reasonable to infer that persons supplying information about the conduct of a suspected criminal would so assume. Accordingly, unless there appears to be evidence to the contrary in the documents, the court will find that persons who supplied information about the conduct of the Powells or Schuman did so under an implied assurance of confidentiality.

▮ However, the same inference may not be properly drawn from the mere fact that certain persons supplied the FBI with general information about issues not directly related to the conduct of the Powells. It is not clear that persons who supplied information about the alleged conduct of the United States in Korea, a subject beyond the normal trial issues of whether defendants engaged in certain conduct and with what state of mind, did so under an implied inference of confidentiality. Moreover, many of these persons may have been under a military duty to supply the requested information and had no expectation that the information and their identity would not be disclosed at trial or to the public at the discretion of their superiors. For these individuals who revealed this sort of information this court must review the documents submitted and determine whether

they supplied information under circumstances from which an implied assurance can be reasonably inferred.

▮ The Department also appears to contend that persons who were prospective witnesses and even persons who actually testified at the Powells' trial are confidential sources. However, it is difficult for the court to see in what sense these witnesses are confidential. The extremes provide a helpful contrast. Clearly, witnesses who actually testified at trial should not generally be considered confidential sources. Once a witness testifies his or her identity is disclosed, and no purpose is served by further withholding of the source's identity in an FOIA suit. The contexts in which contrary conclusions were reached in *Kiraly v. F.B.I.,* 728 F.2d 273 (6th Cir.1984), and *Brown v. FBI,* 658 F.2d 71 (2d Cir.1981) are entirely different from the situation here. In *Kiraly* and *Brown* recent prosecutions had occurred and the security of victims and witnesses of violent offenses was involved.

On the other hand, a person may supply information under an assurance of confidentiality with the condition that he or she may possibly be subpoenaed to testify if criminal charges are ever brought. Although such an assurance is qualified, the source may still reasonably expect confidentiality because whenever someone supplies information to the FBI there is always the possibility that he or she may be subpoenaed to testify. The mere hypothetical possibility is not enough to vitiate the expectation of privacy.

In the instant case, it appears that the bulk of the Department's deletions for prospective witnesses fall somewhere between these two examples. The Powell-Schuman case was a highly publicized criminal prosecution. For those prospective witnesses who willingly agreed to testify, there was a concrete expectation that their identities would be revealed within a short period of time. To deem these persons implied confidential sources accords neither with the plain meaning of "confidential," nor with the legislative purpose of Exemption 7D to

safeguard the FBI's ability to obtain the cooperation of sources of information. *See Robbins Tire,* 563 F.2d at 733–34.[16] The court will carefully review the documents to determine the specific circumstances under which the source agreed to testify and will then decide whether an implied assurance can reasonably be inferred.

■■■ Finally, as discussed above, where the government has already revealed the identities of sources in previous FOIA releases, it has clearly waived any claim to withhold their identities to protect confidentiality. Defendants shall provide sufficient specific information regarding earlier disclosures of those persons identified by plaintiff and others of which defendant is aware so that the court can determine whether each revelation actually constitutes a waiver. The court will grant summary judgment for all information withheld under Exemption 7D where such waivers have been made.

### b. *Confidential Information Supplied Only by the Confidential Source*

■■■ Pursuant to 7D, the Department has also deleted all information supplied by confidential sources. There are two problems with these deletions. First, the Department must show that the information was obtained by a "criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation." 5 U.S.C. § 552(b)(7)(D). This requirement is similar to the threshold Exemption 7 law enforcement purpose requirement, but much stricter. *See Dunaway,* 519 F.Supp. at 1080. Thus, for instance, if the records compiled on the Powell-Schuman defense committees can pass the threshold rational nexus test, they still

may not pass the requirement for the exemption for confidential information.

Second, the agency must also establish that the confidential information deleted came only from the confidential source being protected. *See Church of Scientology v. United States Department of Justice,* 612 F.2d 417, 428 (9th Cir.1979); *Iglesias,* 525 F.Supp. at 564–65. The Department's affidavits are silent on this point. In the absence of further information from the Department the court will be forced to conclude that the agency cannot meet its burden of proof.

### D. *Documents Outside the Scope of Plaintiff's Request*

The FBI has refused to release over 625 documents and portions of other documents on the grounds that they are outside the scope of plaintiff's request. Additionally, despite plaintiff's repeated applications, the Agency has refused to provide a definition of how it interprets the scope of plaintiff's request. The most it has said is that the documents do not relate to the subject of plaintiff's request. It does not explain in what sense the documents do not relate or why. Yet these documents were in the Powell-Schuman file in the Criminal Division of the Department and were forwarded to the FBI for FOIA review.

The Department shall specify the nature of these documents so the court may determine whether they are indeed outside the scope of plaintiff's request.

In *Dunaway* the court set forth the relevant standard for such a determination:

> The agency is obliged to release any information, subject to the specified exemptions, which relates to the subject of

---

**16.** While in *Dunaway,* 519 F.Supp. at 1081, the court rejected the argument that the fact that a source might be called upon to testify at a trial if charges are ever brought eliminates the source's confidential status, *Dunaway* is distinguishable from the instant case. In *Dunaway* the possibility that a source would be called upon to testify was highly speculative in that the government was engaging in general information gathering rather than the good faith enforcement of penal or national security statutes. Apparently the government was not even contemplating bringing criminal charges. By contrast, in the instant case the Department had already indicted the Powells and Schuman, and the case was highly publicized. For most sources who agreed to testify, the possibility of being called to testify was far less speculative than in *Dunaway.*

the request or which in any sense sheds light on, amplifies, or enlarges upon that material which is found in the same documents.

519 F.Supp. at 1083. The court will review the documents in accordance with this standard.

IT IS ORDERED that the Department shall, within sixty (60) days from the date of this order, indicate which information, if any, it has chosen to release after considering the court's order so that the court will not review those deletions *in camera.*

IT IS FURTHER ORDERED that the Department shall have sixty (60) days from the date of this order to submit supplemental affidavits or declarations supporting its exemption claims as required by this decision.[17]

---

17. In view of the fact that this opinion requires or permits the parties to make additional submissions on a variety of issues, the court has, in a separate summary order filed today, enumerated the areas in which additional submissions are to be made.