Peter IRONS, et al.,
Plaintiffs, Appellees,

v.

FEDERAL BUREAU OF INVESTIGA-
TION, et al., Defendants, Appellants.

No. 87–1516.

United States Court of Appeals,
First Circuit.

Heard Dec. 7, 1988.

Decided July 24, 1989.

Deborah Ruth Kant, Appellate Staff, Civ. Div., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Washington, D.C., Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., and Leonard Schaitman, Appellate Staff, Civ. Div., Dept. of Justice, Washington, D.C., were on briefs, for appellants.

Edward Greer, Philadelphia, Pa., for appellees.

Before CAMPBELL, Chief Judge, BOWNES, BREYER, TORRUELLA and SELYA, Circuit Judges.

## OPINION EN BANC

BREYER, Circuit Judge.

The plaintiffs in this case, academic historians researching the McCarthy Era, have sued the government under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 (1982 & Supp. IV 1986). The plaintiffs want the Federal Bureau of Investigation ("FBI") to give them information contained in the FBI's Smith Act prosecutions file, information that would reveal what certain FBI informants, who testified at the Smith Act trials of alleged Communist leaders in the 1950s, had told the FBI (and other related material about those informants). The FOIA provides that "upon any request for records" following certain procedures, the agency "shall make the records promptly available to any person." 5 U.S.C. § 552(a)(3). But this broad disclosure provision is limited by several exemptions. The FBI refused to release the files to the plaintiffs, relying on FOIA exemption 7(D), which permits the government to withhold records or information compiled for law enforcement purposes that:

> *could reasonably be expected to disclose the identity of a confidential source ...* and, in the case of a record or information compiled by criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, *information furnished by a confidential source.*

5 U.S.C. § 552(b)(7)(D) (emphasis added).

The legal question presented in this case is whether, despite the exception to disclo-

sure afforded the FBI by the literal terms of exemption 7(D), the information should nevertheless be made available to the plaintiffs on the ground that the "confidential sources," by testifying at public trials concerning some of their communications to the FBI, "waived" the FBI's right to invoke exemption 7(D). The district court held that, because the informants had testified in public about these matters, much of the requested information no longer fell within the scope of exemption 7(D). On appeal, a panel of this court held that informants, by actually testifying publicly, "waived" the protections of exemption 7(D), but only *insofar as they then actually revealed* the information in question *or insofar as the information in question would have fallen within the "hypothetical scope of cross examination"* at the previous public trial. 851 F.2d 532 (1st Cir.1988) (subsequently withdrawn). *Cf. Irons v. F.B.I.,* 811 F.2d 681 (1st Cir.1987) (*"Irons I"*) (holding that mere willingness to testify publicly did *not* "waive" exemption 7(D)).

The government asked for rehearing en banc. It pointed out that FOIA's disclosure windows are open to *every* member of the public: a rule of law that permits reputable historians to conduct historical research will permit, to the same extent, the most disreputable criminals to search out the identity and knowledge of those who inform against them. *See United States Department of Justice v. Reporters Committee for Freedom of the Press,* —— U.S. ——, 109 S.Ct. 1468, 1480–81, 103 L.Ed.2d 774 (1989) ("Congress 'clearly intended' the FOIA 'to give *any* member of the public as much right to disclosure as one with a special interest [in a particular document]'," quoting *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975) (emphasis added)). The government argued, in light of the fact that the rule of law enunciated in this case will apply well beyond the present Smith Act context to the entire realm of investigations governed by exemption 7(D), that the portion of the panel's rule italicized above (the portion dealing with cross-examination) would bring too much confidential information into the public domain. The government urged that this rule is not a legally permissible interpretation of exemption 7(D). We granted the petition for rehearing en banc, vacating and withdrawing the panel opinion. *See* 851 F.2d 532 (1st Cir.1988). We have reconsidered the district court's interpretation and application of exemption 7(D), and we conclude that the government is correct about the generally applicable rule of law. For that reason these plaintiffs are not legally entitled to the information they seek.

## I.

To understand our answer to the legal question now before us, the reader must keep the following background circumstances in mind. First, the law permits the FBI to withhold *both* (1) information that "could reasonably be expected to disclose the identity of a confidential source," *and* (2) "information furnished by a confidential source" (where the FBI has received the information in the course of a criminal or national security intelligence investigation). 5 U.S.C. § 552(b)(7)(D).

Second, for purposes of this rehearing en banc, we take as given the fact that the relevant sources here are "confidential." A person is a confidential source

"if the person provided information under an express assurance of confidentiality or in circumstances from which such an assurance could be reasonably inferred." S.Rep.No. 1200, 93d Cong., 2d Sess. 13 (1974) U.S. Code Cong. & Admin. News, 6267, 6291 (Conference Report).

*Lame v. United States Department of Justice,* 654 F.2d 917, 923 (3rd Cir.1981). The sources here received the requisite "assurance of confidentiality." *See Keys v. United States Department of Justice,* 830 F.2d 337, 345 (D.C.Cir.1987); *Irons I,* 811 F.2d at 686 (assurance of confidentiality is " 'inherently implicit in FBI interviews conducted pursuant to a criminal investigation' ") (quoting *Miller v. Bell,* 661 F.2d 623, 627 (7th Cir.1981) (per curiam), *cert. denied,* 456 U.S. 960, 102 S.Ct. 2035, 72 L.Ed.2d 484 (1982)) (citations omitted).

Sometimes, of course, the fact that a source later gave public testimony might show that a law enforcement agency *never* gave a valid assurance of confidentiality in the first place, *see, e.g., Van Bourg, Allen, Weinberg & Roger v. N.L.R.B.,* 751 F.2d 982, 986 (9th Cir.1985); *Poss v. N.L.R.B.,* 565 F.2d 654, 658 (10th Cir.1977); *Climax Molybdenum Co. v. N.L.R.B.,* 407 F.Supp. 208, 209 (D.Colo.1975), *aff'd on other grounds,* 539 F.2d 63 (10th Cir.1976); and sometimes it might show that an assurance was intended by all parties to expire after a certain time, *e.g. Nemacolin Mines Corp. v. N.L.R.B.,* 467 F.Supp. 521, 524–25 (W.D. Pa.1979). But such is not the situation here. *Irons I,* 811 F.2d at 685–86 & n. 2.

Third, the information here at issue falls within the *literal* language of the second clause of the exemption. That is to say, it was "furnished by a confidential source" (though long ago). The words "furnished by a confidential source" do not mean that the information or the identity of the source is secret; they simply mean that the information was "provided in confidence" at the time it was communicated to the FBI. *Shaw v. F.B.I.,* 749 F.2d 58, 61 (D.C. Cir.1984); *L & C Marine Transport, Ltd. v. United States,* 740 F.2d 919, 925 n. 8 (11th Cir.1984); *Radowich v. United States Attorney, District of Maryland,* 658 F.2d 957, 959 (4th Cir.1981); *Keeney v. F.B.I.,* 630 F.2d 114, 117, 119 n. 2 (2d Cir.1980).

Fourth, we are not considering the FBI's refusal to make available information restating what the sources *in fact* revealed at the Smith Act trials. In this dispute the government does not contest the plaintiffs' right to obtain documents that reveal no more than what the FBI sources have already revealed at trial, even though other courts have upheld, under exemption 7(D), the FBI's refusal to disclose such information. *See L & C Marine Transport,* 740 F.2d at 925 (law enforcement agencies need not disclose information about source identity even though the source's identity is already publicly known); *Radowich,* 658 F.2d at 960 (same); *Lame,* 654 F.2d at 925 ("subsequent release or publication ... of a portion of the information [originally given in confidence] does not negate the exemp-

tion for *any* of the information originally given") (emphasis added; footnote omitted); *Lesar v. United States Department of Justice,* 636 F.2d 472, 491 (D.C.Cir.1980) (same). We focus here only upon the plaintiffs' claim that they are entitled to more than what the Smith Act trials *in fact* brought to light.

One might wonder, in light of what we have just written, how the plaintiffs could plausibly claim that they are entitled to the information they seek. After all, most of the information sought falls within the plain language of exemption 7(D): "information furnished by a confidential source." Why, at least in respect to this information, is the literal language not the end of the matter? The reason that the plaintiffs' claim is plausible is that some courts have written opinions that use the word "waiver" when discussing exemption 7(D); one might therefore argue that a "confidential source" could "waive" the exemption and that the statute foresees courts defining the scope of any such "waiver." *See, e.g., Ingle v. Department of Justice,* 698 F.2d 259, 269 (6th Cir.1983); *Miller v. Bell,* 661 F.2d at 628; *Radowich,* 658 F.2d at 960; *Powell v. United States Department of Justice,* 584 F.Supp. 1508, 1530 (N.D.Cal. 1984). The plaintiffs argue that the sources' testifying amounted to such a "waiver." Indeed, the panel in the present case agreed and undertook the difficult task of defining a "waiver's" scope.

Thus, as mentioned at the outset, the legal question before us is whether the law requires us to interpret the language of exemption 7(D) rather literally or whether we may interpret it as embodying some kind of "waiver" doctrine. To answer this question, we have examined the statute, its history, and the case law in some detail. We have concluded that we must take the statute here to mean what it says.

## II.

Our reasons for concluding that the information sought here falls within exemp-

tion 7(D), and that the concept of "waiver" does not apply, are the following:

*First,*

The starting point in statutory interpretation is "the language [of the statute] itself." *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756 [95 S.Ct. 1917, 1935, 44 L.Ed.2d 539] (1975) (Powell, J., concurring). "[W]e assume that the legislative purpose is expressed by the ordinary meaning of the words used." *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68 [102 S.Ct. 1534, 1537, 71 L.Ed.2d 748] (1982) [citation omitted].

*United States v. James,* 478 U.S. 597, 604, 106 S.Ct. 3116, 3120, 92 L.Ed.2d 483 (1986). *Accord Allende v. Schultz,* 845 F.2d 1111, 1116–17 (1st Cir.1988). The language of the exemption's second clause, giving all its words their "ordinary meaning," permits the government to withhold "information furnished by a confidential source" to a "criminal investigation ... or national security intelligence investigation." 5 U.S.C. § 552(b)(7)(D). This language squarely applies here. Neither this language, nor any other relevant language, says anything at all about "waiver." Other courts (indeed virtually all other courts) have interpreted the statute's language literally in this respect. The Third Circuit, for example, has said that *"all* the information given by a confidential source is exempt," that "the release of a portion of such information does not lift the blanket exemption," and that the "subsequent disclosure of information originally given in confidence does not render nonconfidential *any* of the information originally provided." *Lame,* 654 F.2d at 925 (3d Cir.1981) (emphasis added). *See also Kiraly v. F.B.I.,* 728 F.2d 273, 278–80 (6th Cir.1984); *Lesar,* 636 F.2d at 491–92 (D.C.Cir.1980); *Scherer v. Kelley,* 584 F.2d 170, 176 n. 7 (7th Cir.1978), *cert. denied* 440 U.S. 964, 99 S.Ct. 1511, 59 L.Ed.2d 778 (1979). *Accord L & C Marine Transport,* 740 F.2d at 923–25 (11th Cir.1984) (same in a case of civil law enforcement); *Brown v. F.B.I.,* 658 F.2d 71, 75 (2d Cir.1981) (same for a related FOIA exemption). We ourselves have made clear that the district courts are not to balance interests under

exemption 7(D), but rather simply to apply the criteria listed in the statute. *Irons I,* 811 F.2d at 685 ("the judiciary is not permitted to undertake a balancing of conflicting interests, but is required to uphold a claimed 7(D) exemption so long as the statutory criteria are met."). *Accord Curran v. Department of Justice,* 813 F.2d 473, 474 (1st Cir.1987); *L & C Marine Transport,* 740 F.2d at 925; *Lame,* 654 F.2d at 923; *Lesar,* 636 F.2d at 492; *Sands v. Murphy,* 633 F.2d 968, 971 (1st Cir.1980).

*Second,* the fairly elaborate legislative history of exemption 7(D) suggests that Congress intended a literal interpretation, even where a literal application sweeps broadly. That history makes clear that Congress enacted the exemption in major part to help law enforcement agencies to recruit, and to maintain, confidential sources; its object was not simply to protect the source, but also to protect the flow of information to the law enforcement agency. *See Irons I,* 811 F.2d at 688 (policy of exemption 7(D) is to prevent "chilling effect on third parties [which] would significantly limit the prospective flow of information to the sovereign"); *Church of Scientology of California v. United States Department of Justice,* 612 F.2d 417, 423–26 (9th Cir.1979) (surveying legislative history and concluding that exemption 7 was designed "so that law enforcement agencies would not be adversely affected in their lawful investigatory duties"); *Scherer,* 584 F.2d at 176 & n. 7; *T.V. Tower, Inc. v. Marshall,* 444 F.Supp. 1233, 1237 (D.D.C. 1978) ("the fundamental purpose of exemption 7(D) [is] the enhancement of agencies' enforcement abilities by permitting them to withhold [information]").

The plaintiffs have suggested that the statute codifies a common law "informants' privilege," a privilege that one might waive; but the statute's legislative history makes no significant reference to such a "privilege." Rather, the legislators refer to their law enforcement policy goals. Plaintiffs point to a judicial decision, *Westinghouse Electric Corp. v. City of Burlington, Vermont,* 351 F.2d 762 (D.C.Cir. 1965) (citing *Roviaro v. United States,* 353

U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957)), for the proposition that exemption 7(D) codifies a common law "informant's privilege." But *Westinghouse* expressly restricts the privilege of which it speaks to "the identity of the informer;" it says the privilege does not apply to the "content of the communication," *Westinghouse*, 351 F.2d at 768. *See Roviaro*, 353 U.S. at 59–62, 77 S.Ct. at 627–29 (same). Thus, Congress' subsequent enactment in 1974 of exemption 7(D)'s second clause protecting "information furnished" could not have reflected any "common law" aspect of the privilege discussed in *Westinghouse. Cf. Han v. Food & Nutrition Service, U.S. D.A.*, 580 F.Supp. 1564, 1568–69 (D.N.J. 1984) (characterizing only "identity" clause of exemption 7(D) as a "privilege"). Nor do we think, in contrast to the dissent, *post* p. 1458, that Congress' 1974 FOIA legislation necessarily embodied the exact views of FOIA set forth a year earlier by the Supreme Court, *see EPA v. Mink*, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), or nine years earlier in the 1965 Senate Report relied on by *Mink*, 410 U.S. at 80, 93 S.Ct. at 832.

Instead, the second clause of exemption 7(D) responds to President Ford's criticisms of an initial version of the Freedom of Information Act, in particular the criticism that it might hinder law enforcement efforts. *See Keeney*, 630 F.2d at 118; *Church of Scientology*, 612 F.2d at 422–23, 425. Congress responded by modifying exemption 7(D), adding the second clause's language protecting "information furnished by a confidential source." In doing so, the Act's sponsors made statements suggesting an intent to have this language apply broadly and therefore quite literally. Senator Phillip Hart, for example, one of the chief architects of the exemption, explained the meaning of the language in question as follows:

> The major change in conference was the provision which permits law enforcement agencies to withhold 'confidential information furnished only by a confidential source'. In other words, the agency not only can withhold information which would disclose the identity of a confiden-

tial source but also can provide blanket protection for any information supplied by a confidential source. The President is therefore mistaken in his statement that the FBI must prove that disclosure would reveal an informer's identity; *all the FBI has to do is to state that the information was furnished by a confidential source and it is exempt.* In fact, this protection was introduced by the conferees in response to the specific request of the President in a letter to Senator Kennedy during the conference. All of the conferees endorsed the Hart amendment as modified.

Source Book: Legislative History, Texts, and Other Documents, Freedom of Information Act and Amendments of 1974 (P.L. 93–502), Joint Committee Print, March 1975, at 451 ("Source Book"), *quoted in Radowich*, 658 F.2d at 962 (emphasis added). Despite these changes, President Ford vetoed the bill, and Congress acted to override the veto. *See Radowich*, 658 F.2d at 963; *Keeney*, 630 F.2d at 118; *Church of Scientology*, 612 F.2d at 423. Speaking in favor of the override, Senator Kennedy, the Chairman of the Senate conferees, then reassured the Senate:

> Then we also provided [in 7(D)] that there be no requirement to reveal not only the identity of a confidential source, but also any information obtained from him in a criminal investigation. The only source information that would be available would be that compiled in civil investigations.

Source Book at 459, *quoted in Radowich*, 658 F.2d at 963. And Senator Byrd, the Senate majority leader, added that any fear that the Act would hinder law enforcement was groundless in light of the new language in 7(D). He said:

> The Senate-passed version of the bill contained an amendment which would have required disclosure of information from a law enforcement agency unless certain information was specifically exempted by the act. *What particularly disturbed me was that while the identity of an informer would be protected, the confidential information which he*

*had given the agency would not have been protected from disclosure ....* I was deeply concerned that without such protection, law enforcement agencies would be faced with a *'drying-up'* of their sources of information and their criminal investigative work would be seriously impaired.

The bill in the form now presented to the Senate has been significantly changed by the conference on these critical issues.... *The language has also been broadened substantially to protect from disclosure all of the information furnished by a confidential source to a criminal law enforcement agency if the information was compiled in the course of a criminal investigation.*

Source Book at 468, *quoted in Radowich,* 658 F.2d at 963–64 (emphasis added).

Contrary to the dissent, *see post* pp. 1459–1460, we believe that Senator Byrd had reason to say what he did, and therefore to have meant what he said. Consider the informant who testifies in public and reveals at trial (i) that Joe participated in an organized crime numbers racket, but who does not say that he has also confidentially told the FBI (ii) that Wes, Lola, George, and Yvette were also involved and that the racket included loan sharking, bribery, and murder. The disclosure of item (i), and of the informant's identity as the source of *that* information, may lead the informant to fear reprisals from Joe's friends; but the disclosure of item (ii), and of the informant's role as the source of it, could mean far more in the way of reprisals from friends of Wes, Lola, George and Yvette. One can understand why confidential sources might hesitate to talk if disclosure at trial of something like item (i) means that organized criminals have the legal right to obtain the information in item (ii) from the FBI through the FOIA, information that the defendants at trial legally could ask about but would not be likely to, say because of its damaging implications for Joe or because of its more minor importance to the trial of Joe. *See infra* pp. 1455–1456. Thus, even though one might debate the relevant probabilities of any or all of these events, across the minerun of typical cases, one can see why Senator Byrd might have expressed concern.

Congress may also have wanted the law to contain the language it wrote in 7(D), because the other exemptions in exemption 7 offer somewhat narrower protection. Exemption 7(A), for example, authorizes withholding information whose disclosure "could reasonably be expected to interfere with enforcement proceedings," 5 U.S.C. § 552(b)(7)(A). It does not apply to sources who cooperated in now-completed enforcement proceedings. Exemption 7(C) only applies when disclosure could work an "unwarranted invasion of personal privacy;" such invasion might, or might not, be found when the source's information is about other persons, say those who have already been convicted; and in any event the exemption erects a balancing test which gives the source less guarantee of confidentiality. Exemption 7(E), which applies when production of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions," 5 U.S.C. § 552(b)(7)(E), does not protect sources' information about the acts of others unless disclosure indicates how the agency investigated the case. And, exemption 7(F), while authorizing withholding of information which "could reasonably be expected to endanger the life or physical safety of any individual," 5 U.S.C. § 552(b)(7)(F), says nothing about non-physical threats, such as a business boycott or cruel harassment of vulnerable family members. Nor does 7(F) clearly protect against threats that the FOIA judge cannot assess in some reasonably concrete terms—a particular problem when the information concerns events in the more distant past. Taken together these exemptions do not reach every important corner of exemption 7(D)'s domain. Thus, it is not unreasonable to believe that Congress, both in the words of 7(D) and in its legislative history, meant what it said.

In sum, the history is not ambiguous. It shows that in 1974 the Congress, anxious to strengthen a Freedom of Information Act applicable to nearly all the federal government, sought to lessen opposition to

the proposal by simultaneously enacting a broad exemption for law enforcement. In 1986, Congress acted again to broaden exemption 7(D), making certain wording changes (such as the deletion of the word "only" after the words "information furnished") so as to "broaden the reach of this exemption and to ease considerably a Federal law enforcement agency's burden in invoking it." 199 Cong.Rec. S16504 (daily ed. October 15, 1986) (statement of Sen. Hatch), quoted in *Irons I*, 811 F.2d at 687. Since the words of the statute say nothing about a waiver doctrine, and since there is no "clearly expressed legislative intention to the contrary," the statute's plain language must "be regarded as conclusive." *CPSC v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Even were we to read the history for its *least* significance, it would indicate that, before courts find any "waiver" of exemption 7(D)'s protections, they must consider the interests of the law enforcement agency as well as those of the source; and this fact, in turn, would have to mean that "waiver" by "sources" will not automatically prove sufficient to release the information.

*Third,* given this history, it is not surprising to find, as we have already pointed out, that the circuits have not only used broad language to describe the application of exemption 7(D), *see supra* pp. 1449, but that they have also specifically interpreted the "information furnished" exemption to apply irrespective of subsequent public identification of the source, *see L & C Marine Transport,* 740 F.2d at 925; *Kiraly,* 728 F.2d at 278; *Radowich,* 658 F.2d at 960, and *irrespective of subsequent public release of portions of the information provided by the source, see Lame,* 654 F.2d at 925; *Lesar,* 636 F.2d at 491; *Scherer,* 584 F.2d at 176 n. 7. Those courts concluded that FBI disclosure through the FOIA, by confirming what had become public through other sources, could nonetheless *either* harm the source *or* harm the agency's ability to recruit other sources, and they therefore applied the literal language of exemption 7(D) to protect the information. They have also interpreted

the exemption to apply irrespective of the nature of the information (so long as the information meets the criteria in the exemption). *See Keys,* 830 F.2d at 341, 345 (decades-old information); *Weisberg v. United States Department of Justice,* 745 F.2d 1476, 1492 (D.C.Cir.1984) (specific nature of information irrelevant); *Diamond v. F.B.I.,* 707 F.2d 75 (2d Cir.1983) (McCarthy era information), *cert. denied,* 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); *Lesar,* 636 F.2d at 492 (specific contents of information not relevant); *Lamont v. Department of Justice,* 475 F.Supp. 761 (S.D. N.Y.1979) (McCarthy era Smith Act documents).

*Fourth,* while courts in some exemption 7(D) cases have used the word "waiver," *see supra* 1448 and *infra* 1454–56, they have not used that word in any context or in any way that argues for application of a "waiver doctrine" in the type of case before us.

Courts generally use the concept of "waiver" in the law in four related sorts of circumstances. (1) Courts sometimes say an individual has "waived" a protection the law grants him when the individual *expressly* says that he wishes to do without the protection. *See, e.g., Miranda v. Arizona,* 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966) ("express statement ... could constitute a waiver" of Fifth Amendment right against self-incrimination); *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.,* 752 F.2d 178, 183 (5th Cir.1985) ("waiver of rights [to rescind a contract] may result where a party demonstrates intentional relinquishment of rights of which the party has full knowledge"). *See also Irons I,* 811 F.2d at 686 (citing cases of intentional express waiver).

(2) Courts sometimes *infer* from an individual's statements or conduct that the individual wishes to forego a protection, even though the courts remain somewhat uncertain about what the individual would really say were he presented with the choice anew before the court. *See, e.g., United States v. Gann,* 732 F.2d 714, 722–23 (9th Cir.), *cert. denied,* 469 U.S. 1034,

105 S.Ct. 505, 83 L.Ed.2d 397 (1984) (communication in presence of third party indicates that communication's confidentiality for purposes of attorney-client privilege is waived); 2 J. Weinstein & M. Berger, Weinstein's Evidence 503–37 & n. 5 (1988 & Cum. Supp. May 1988) (same); *United States v. Collins,* 690 F.2d 431, 439 (5th Cir.1982) (party may not complain on appeal of errors invited or induced by its own conduct at trial), *cert. denied,* 460 U.S. 1046, 103 S.Ct. 1447, 75 L.Ed.2d 801 (1983); *United States v. Krynicki,* 689 F.2d 289, 291 (1st Cir.1982) (failure to raise issue at trial waives right to appeal on that ground). *See also Irons I,* 811 F.2d at 686–87 (citing cases on waiver implied by conduct).

(3) Courts may also use the word "waiver" as a way of insisting that an individual forego protection which he says that he does *not* wish to give up but which he has *agreed* to give up in the past. *See, e.g., Schmid v. National Bank of Greece,* 622 F.Supp. 704, 714–15 (D.Mass.1985) (enforcing contractual release of right to sue other party), *aff'd,* 802 F.2d 439 (1st Cir.1986); *Anselmo v. Manufacturers Life Insurance Co.,* 595 F.Supp. 541, 549–51 (W.D. Mo.1984) (enforcing contractual release of right to sue, and encouraging settlements incorporating such releases), *aff'd,* 771 F.2d 417 (8th Cir.1985); *Wilhelm v. Baxter,* 436 F.Supp. 1322, 1326–27 (S.D.Ill.1977) (finding purchase of liability insurance to waive local government's immunity from suit).

(4) Finally, courts sometimes insist that an individual forego protection that he does not wish to give up, in order to avoid unfairness to others, such as adversaries in litigation who might suffer harm were a factfinder to be misled, say, by a partial disclosure of relevant information. Thus the "rule of completeness" provides for "the right of the opponent, against whom the utterance is offered, to put the remainder in evidence on cross-examination or as part of his case.... subject to the general principles of relevancy," 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 106[02] at 106–17 (1988), even though the remainder would not by itself have been admissible. *See* 7 J. Wigmore, Evidence §§ 2094–

125 (Chadbourn rev.1978) (formulating rule of completeness); *United States v. LeFevour,* 798 F.2d 977, 980–82 (7th Cir.1986) (discussing alternative remedies); *United States v. Pierre,* 781 F.2d 329, 331 (2d Cir.1986) (rule as applied to prior consistent statements); *Brewer v. Jeep Corp.,* 724 F.2d 653, 657 (8th Cir.1983); *United States v. Rubin,* 609 F.2d 51, 63 (2d Cir.1979), *aff'd on grant of certiorari limited to other issue,* 449 U.S. 424, 428, 101 S.Ct. 698, 700, 66 L.Ed.2d 633 (1981); *id.,* 609 F.2d at 70 (Friendly, J., concurring) ("the great principle of completeness"); *United States v. Jamar,* 561 F.2d 1103, 1108–09 (4th Cir.1977); *United States v. Fayette,* 388 F.2d 728, 733–34 & n. 2 (2d Cir.1968). *See also* Fed.R.Evid. 410 (last paragraph, part (i): otherwise inadmissible statement from plea negotiation is admissible where another statement from that negotiation has been introduced and fairness requires that the statements be considered together). Similarly, courts have held that a defendant's voluntary act of taking the stand to testify on his own behalf waives his Fifth Amendment right against self-incrimination, because otherwise the defendant could unfairly reveal to the jury partial information supporting his case while claiming immunity to cross-examination about the rest of the story. *See Brown v. United States,* 356 U.S. 148, 154–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958); *United States v. Black,* 767 F.2d 1334, 1341 (9th Cir.), *cert. denied,* 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985).

The first example is obviously inapplicable here, where neither source nor agency has asserted any intention to "waive" exemption 7(D). Nor is it sensible to apply "waiver" of the second variety, waiver reflecting a court's efforts to infer from surrounding circumstances that the source himself actually wishes disclosure. That is because exemption 7(D) is not designed solely to protect the source. As discussed above, it mainly seeks to protect law enforcement agencies in their efforts to find future sources. Any legal principle that finds "waiver" and then requires disclosure in ambiguous circumstances would work

against that statutory end. To reach this conclusion one need not believe that sources make fine spun risk-benefit calculations (*e.g.,* "I'll talk to the FBI if I'll only run the risk of eventually testifying and being cross-examined, but I won't talk if an FOIA requestor can get the information"). One need only, and more reasonably, believe that, as a general matter, the more confidential information that appears in public (contrary to the true desire of the source), the harder it becomes for the law enforcement agency to recruit confidential sources. That being so, there is no reason to apply the "waiver" doctrine where not only is there no indication that the sources *actually wanted* to make public the information they did not in fact made public, but also the agency itself does not want such disclosure. There is no reason to apply concepts of express waiver or waiver inferred from conduct—notions applicable in other legal contexts—to the information now at issue before us.

The last two mentioned examples— where courts force an individual to give up protection against the individual's stated wishes—are irrelevant in this type of Freedom of Information Act case, where the relevant "individual" is not the informant but the law enforcement agency. No one here has agreed to give up protection. Certainly the relevant party—the law enforcement agency—has never agreed to give up the exemption's protection. Nor does "fairness" between parties require disclosure. This type of case arises *outside* the context of litigation; the concerns about self-serving incomplete testimony before a jury, which motivated the courts in crafting the "rule of completeness" and in deciding that the act of testifying waives the right against self-incrimination, are not prompted by a FOIA request. Considerations of an adversarial kind of fairness as between the public (the requestors of the information) and the source (who disclosed information to the agency) are not present in the FOIA context. There is no reason grounded in fairness for requiring a source who disclosed information during testimony to reveal, against his will (or to have the

FBI reveal for him), information that he did not disclose in public.

Examination of the circuit court cases that refer to "waiver" in the context of exemption 7(D) reveals that those cases are not relevant in the present context. We have found five kinds of exemption 7(D) cases that use the word "waiver." (1) In some cases, the courts have held that a source "waived" confidentiality by later explaining that, *before* he or she provided the agency with information, the source had not expected the information would be kept confidential. Those cases are different from this one because the courts in those cases held that the source simply was not a "confidential source." *See Miller v. Bell,* 661 F.2d at 627–28 (finding one witness' information not within exemption 7(D) because she asserted that she had never received assurances of confidentiality; also reaffirming *Scherer,* 584 F.2d 170, which had held no waiver despite public testimony by the source). Here the source was "confidential" and the information was "furnished by a confidential source." *See supra* 1447–1448. (2) In other cases courts have said that even though the relevant information *already is public,* the FBI *nonetheless* need not disclose it because the source has *not* "waived" the exemption. *See Radowich,* 658 F.2d at 960; *Lesar,* 636 F.2d at 491. Such cases, in forbidding disclosure of already public information, obviously do not hold that the FBI must reveal information that has not previously been made public. (3) Still other cases state that public testimony does *not* "waive" protection of information not made public. *See Scherer,* 584 F.2d at 176 n. 7 ("we reject Scherer's argument [that the source 'relinquished' its right to nondisclosure]. Because a person may have given testimony at a trial on a specific topic does not mean that all information offered by that source upon a guarantee of confidentiality automatically becomes available to the person to whom it relates."). These cases support the government, not the plaintiffs. (4) One case says that the FBI cannot "waive" the protection the exemption gives the source. *Ingle v. Department of Justice,* 698 F.2d 259 (6th Cir.

1983). That case says nothing about when, or whether, a source might "waive" protection thereby requiring the FBI to disclose against its will. (5) A single district court case does hold that actual testimony waives the right to nondisclosure. *Powell*, 584 F.Supp. at 1529–30 (N.D.Cal.1984). That case, however, speaks only about the waiver of the right to withhold a source's "identity" once the source has testified; it says nothing about disclosure of the information furnished by the source. In addition, the *Powell* court apparently thought "confidential" meant "secret" at the time of the FOIA request, *id.* at 1529, which, as we have noted above, *supra* 1448, is not the proper interpretation of the term under exemption 7(D) (rather, "confidential" under 7(D) means "provided in confidence" to the agency).

The plaintiffs also point to several labor law cases interpreting exemption 7(D). Those cases, however, are beside the point. For one thing, those cases concern an issue different from the one before us. They consider whether a source, knowing he is likely to testify at the time he furnishes information to the agency, is, or remains after testimony, a "confidential source" within the meaning of the statute—a point not here in issue. *See Van Bourg*, 751 F.2d at 986; *Poss*, 565 F.2d at 658; *Nemacolin Mines*, 467 F.Supp. at 524; *Mylan Pharmaceuticals, Inc. v. N.L.R.B.*, 407 F.Supp. 1124, 1127 (W.D.Pa.1976); *Climax Molybdenum*, 407 F.Supp. at 209. *See supra* 1447–48 (sources here are "confidential"). In addition, these labor cases involve civil law enforcement, not criminal law enforcement; hence, they involve only the *first clause* of exemption 7(D), the clause that protects the "identity of a confidential source," not the second clause that protects "information compiled by a criminal law enforcement authority in the course of a criminal investigation [and] furnished by a confidential source." 5 U.S.C. § 552(b)(7)(D). *See* statement of Sen. Kennedy, *supra; Keys*, 830 F.2d at 343; *Akron Standard Division of Eagle–Picher Industries, Inc. v. Donovan*, 780 F.2d 568, 573, *petition for reh'g denied*, 788 F.2d 1223 (6th Cir.1986); *Lame*, 654 F.2d at 923.

Further, the cases involve OSHA and the NLRB, different enforcement agencies, operating in different statutory and institutional contexts, where sources may have different expectations. It may be, for example, that an NLRB source knows from the beginning that he will have to testify and that his employer will discover his identity; it may be that an FBI source does not know whether he will have to testify and, in any event, believes that testimony will not necessarily reveal all the "information" he has "furnished" the FBI. Finally, the circuits themselves are in conflict over the holding that the sources are not "confidential," even in the labor law enforcement and statutory context in which they arise. *Compare United Technologies Corp. v. N.L.R.B.*, 777 F.2d 90 (2d Cir.1985) (finding source is confidential and no waiver); *L & C Marine Transport*, 740 F.2d 919 (no waiver), *with Van Bourg*, 751 F.2d 982 (not confidential); *Poss*, 565 F.2d 654 (same); *Nemacolin Mines*, 467 F.Supp. 521 (same); *Mylan Pharmaceuticals*, 407 F.Supp. 1124 (same); *Climax Molybdenum*, 407 F.Supp. 208 (same). The one circuit that has directly considered whether its "labor context" holding applies in the criminal law context has indicated that it does not. *Akron Standard Division of Eagle–Picher Industries v. Donovan*, 788 F.2d 1223 (6th Cir. 1986) (denying petition for rehearing en banc) ("we wish to make it clear that we do not thereby abandon the analysis of this court in *Kiraly*" (which concluded, in the "criminal context," that testimony by a source does not waive exemption 7(D))).

In a nutshell, some cases use the word "waiver" in the context of saying that a person was not a "confidential source;" others use it in the context of saying protection was *not* "waived." Those cases do not support the proposition that courts may declare a "waiver," over an agency's objection, of the protections the statute gives to information that was furnished by a confidential source.

*Fifth,* the judicial effort to create a "waiver" exception to exemption 7(D)'s language runs afoul of the statute's "intent to provide 'workable' rules." *FTC v. Grolier,*

*Inc.,* 462 U.S. 19, 27, 103 S.Ct. 2209, 2214, 76 L.Ed.2d 387 (1983); *accord Reporters Committee for Freedom of the Press,* 109 S.Ct. at 1485; *EPA v. Mink,* 410 U.S. at 80, 93 S.Ct. at 832. Consider, for example, the serious problems posed by the "hypothetical scope of cross examination" rule that the dissent advocates here. That rule would permit any member of the public to obtain *now* any information that a confidential source furnished to the FBI in years past if that source ever testified about *any* matter at all *and* the confidential information *might have emerged* in response to questions that a cross examiner *did not ask* but, under the law, *might have asked.* The dissent concedes that this includes "a range of questions" on "a queue of topics," *infra* 1462.

In evaluating the workability of this rule, we note (1) the fact that cross examiners typically ask of their witnesses only a tiny fraction of the questions the law permits them to ask; (2) the fact that lawyers often have a fairly good idea of what cross examiners will not ask about, say, for example, because a defense attorney will not want a testifying source to reveal before the jury all the bad things the source knows about the defendant; and (3) the fact that the judge trying to apply the "hypothetical scope of cross examination" rule is not the judge at the original trial where the source first testified, but is rather the judge at the later FOIA proceeding, where neither the source, nor his counsel, nor the original cross examiner is likely to be present, and which may take place months or years after the original trial.

These three facts pose grave difficulties for the FOIA–suit judge. What rules of evidence are to govern—those presently in effect, in the FOIA–suit jurisdiction, or those of, say, forty years ago when the original trial took place, and in the trial's jurisdiction? How is the FOIA judge to resolve these legal issues? Must she imagine evidentiary rulings on innumerable hypothetical questions? Can she think herself back into the original proceeding in order to determine how that earlier judge might have ruled on the permissible scope of cross examination? Has she given adequate weight, say, to the fear of reprisals that might have affected those earlier rulings, and should she consider such fears?

The prosecutor at the original trial will also face substantial problems in trying to decide whether to have a source testify. The prosecutor might well believe, to use our earlier example, that if the source testifies about Joe's numbers racket, the practical chances that Joe's attorney will wish to delve into related bad conduct by the defendant's somewhat distant associates is small; but under the dissent's rule, the prosecutor must also consider the fact that an FOIA suit could force the FBI to make public all these matters so long as Joe's attorney could legally have asked about them. Can the prosecutor run this additional risk to his source and to his ability to recruit new sources?

No less troublesome will be the position of potential sources. Of course, they must always realize that the information they give *might* someday become public, particularly if they testify. But, under the dissent's rule, can they think other than: "If I testify about *anything,* the public—including those I implicate—will see *everything*"?

Given these practical problems, we can understand (1) why exemption 7(D) contains language that, without qualification, exempts from disclosure "information furnished by a confidential source;" (2) why the statute's legislative history shows that Congress meant what it said; (3) why the case law (with one possible district court exception) rejects any effort to create a "waiver" doctrine where "information" has been "furnished by a confidential source;" and (4) why, despite the sympathetic factual circumstances of the case now before us, the law requires us to draw a line that groups this case with many others in which the need not to disclose is obviously paramount.

### III.

For these reasons, we hold that public testimony by "confidential sources" cannot "waive" the FBI's right under the second

clause of exemption 7(D) to withhold "information furnished by a confidential source" and not actually revealed in public. For basically similar reasons, the first clause of exemption 7(D), protecting information that could reveal "the identity of a confidential source," is not "waived" (notwithstanding subsequent public testimony by the source), insofar as disclosure of information not contained in the public testimony could confirm the source's identity as to some information, or could reveal the source's identity as the provider of other not-yet-disclosed information. Consequently, the plaintiffs are not entitled to information furnished to the FBI by confidential sources, beyond what has been actually disclosed in the source's prior public testimony.

*The judgment of the district court is vacated. This case is remanded for further proceedings consistent with this opinion.*

SELYA, Circuit Judge, with whom BOWNES, Circuit Judge, joins, concurring in part and dissenting in part.

The majority is quite right in finding a waiver of the government's right to invoke Exemption 7(D) for information that "has been actually disclosed in the source's prior public testimony." *Supra* at 1457. But, having found a waiver, the court is overly timeous in sketching its dimensions. We maintain that the scope of the waiver engendered by prior public testimony should be coextensive with that of hypothetical cross-examination. *See infra* Part IV. In our estimation, the court's reluctance to accept such a rule stems from a gross miscalculation of its potential effect on the government's ability to recruit confidential sources. That miscalculation pervades the majority's ensuing analysis, improperly confining the disclosure mandated by the FOIA. Because Congress and the Court instruct us to read the Act less grudgingly, and to apply waiver with somewhat greater breadth, we respectfully dissent.

I

Our disagreement with the majority begins with its phrasing of the question on appeal. Rather than considering whether " 'confidential sources,' by testifying at public trials concerning some of their communications to the FBI, 'waived' the FBI's right to invoke exemption 7(D)," *ante* at 1446–1447, we should begin by deciding where the FBI fits into the exemptive scheme. The assumption that Exemption 7(D) is ultimately for the FBI to waive because courts "must consider the interests of the law enforcement agency as well as those of the source; and this fact in turn suggests that 'waiver' by 'sources' will not automatically prove sufficient to release the information," *ante* at 19; *see also ante* at 24 (Exemption 7(D) "mainly seeks to protect law enforcement agencies"), reflects a sort of tunnel vision.

To be sure, courts must take into account the government's stake in confidentiality— but we fail to find in the majority opinion any analysis of how a limited waiver would effect the underlying agency interest: the ability "to recruit, and to maintain, confidential sources ... to protect the flow of information to the law enforcement agency." *Supra* at 1449. The majority errs— profoundly, we believe—in failing to analyze waiver from either the agency's or the source's point of view. Its reasoning seems instead to be premised on the remarkable assertion that: "One need only, and more reasonably, believe that, as a general matter, the more confidential information that appears in public (contrary to the true desire of the source), the harder it becomes for the law enforcement agency to recruit confidential sources." *Ante* at 1454. This assertion, by its terms, puts the cart well in front of the horse.

With respect, we think proper analytical sequence starts not with the breadth of the exemption, but with the compass and conception of the statute to which it pertains. A policy of forthright and expansive disclosure undergirds the FOIA. *See, e.g., Irons v. F.B.I.,* 811 F.2d 681, 685 (1st Cir.1987) (*Irons I*). The wide sweep of mandated disclosure is commensurate with the law's

principal purpose: to "ensure an informed citizenry, vital to the function of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire and Rubber Co.*, 437 U.S. 214, 242, 98 S.Ct. 2311, 2327, 57 L.Ed.2d 159 (1978); *see also U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, —— U.S. ——, 109 S.Ct. 1468, 1480–82, 103 L.Ed.2d 774 (1989). Of course, exceptions were written into the statute, but there is a telling legal history behind them.

The FOIA was originally enacted because the public disclosure section of the Administrative Procedure Act (then 5 U.S.C. § 1002) "was generally recognized as falling far short of its disclosure goals and came to be looked upon more as a withholding statute than a disclosure statute." *EPA v. Mink*, 410 U.S. 73, 79, 93 S.Ct. 827, 832, 35 L.Ed.2d 119 (1973). This renitency was thought due in part to a "vague" exemptions clause. *Id.* To alleviate uncertainty nine niches were carved, with the clear understanding that "these limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976). The exemptions were designed to prevent "unlimited withholding of files merely by classifying them as investigatory files compiled for law enforcement purposes." *FBI v. Abramson*, 456 U.S. 615, 621, 102 S.Ct. 2054, 2059, 72 L.Ed.2d 376 (1982).

In consequence of the statute's etiology and manifest purpose, the Supreme Court, and this court, have regularly held that exemptions are to be construed narrowly and in keeping with FOIA's overriding goal: that the light of public inquiry be facilitated, not hooded. *See, e.g., U.S. Dep't of Justice v. Julian*, 486 U.S. 1, 108 S.Ct. 1606, 1611, 100 L.Ed.2d 1 (1988); *Rose*, 425 U.S. at 360, 366, 96 S.Ct. at 1598, 1601; *Aronson v. Dep't of Housing and Urban Development*, 822 F.2d 182, 185 (1st Cir.1987). To this end, we have consistently placed on the withholder the burden of establishing an exemption's applicability. *See, e.g., Irons I*, 811 F.2d at 685. Under these interpretive constraints, we find it difficult to accept the agency's unanalyzed assertion that a limited waiver would injure the FBI's recruitment capability. Acceptance of an unproved assertion is, in substantive consequence, little different from acceptance of an unqualified classification.[1] Without more, we should not be parties to the attempt to end run Congress's evident will.

The majority quotes passages from congressional debates proving, it says, that Exemption 7(D), contrary to the general dictates of the Court, should "apply broadly and therefore quite literally." *Ante* at 1450. The effort falls short: the scraps of legislative history cited, *supra* at 1450–51, do not suffice to remit our burden of analyzing the impact of waiver on legitimate agency interest. The opposite is true. Every reference in the legislative history to Exemption 7 generally, and to Exemption 7(D) in particular, says that the exemptions are to be construed stingily. *See, e.g.*, Senate Comm. on the Judiciary & House Comm. on Government Operations, 94th Cong., 1st Sess., Freedom of Information Act and Amendments of 1974 (P.L. 93–502) Source Book: Legislative History, Texts, and Other Documents 36, 65 (Joint

---

1. Clearly, Congress sought to limit an agency's ability to sidestep disclosure requirements. Under the aegis of Senator Hart, blanket protection for investigatory files was forgone; as the Attorney General wrote, "[t]he primary purpose of Senator Hart's amendment to revise exemption 7 was to ... require consideration of the particular document and the need to withhold it." Senate Comm. on the Judiciary & House Comm. on Government Operations, 94th Cong., 1st Sess., Freedom of Information Act and Amendments of 1974 (P.L. 93–502) Source Book: Legislative History, Texts, and Other Documents 515 (Joint Committee Print, March 1975) (Source Book) (quoting Attorney General's Memorandum on the 1974 Amendments to FOIA at 5). Thus, according to the Attorney General's contemporaneous understanding, the FBI should be required to make a plausible showing that a particular category of information falls within the statute's desired ambit of protection. *See also* Source Book at 158 (Congress anticipated that "intent of the exemption" would govern disclosure) (Report of Senate Committee on the Judiciary).

Committee Print, March 1975) (Source Book) (quoting Report of House Committee on Government Operations); *id.* at 117; *id.* at 158 (quoting Senate Report); *id.* at 230 (quoting Joint Explanatory Statement of the Committee of Conference); *id.* at 265, 286, 293, 302, 333, 336, 349, 376, 378, 385, 413, 421 (remarks of various Senators and Representatives). It is, therefore, unsurprising that the philosophy of full disclosure is carefully embodied in the considered reports issued by the committees responsible for formulating the FOIA. *See Mink,* 410 U.S. at 80 & n. 3, 93 S.Ct. at 832 & n. 3.[2] While paying obeisance to the need to keep the FBI's investigatory files confidential, the meaningful portions of the legislative history do so only insofar as "[s]uccess lies in providing a workable formula which encompasses, balances, protects all interests, yet places emphasis on the fullest possible disclosure." *Id.* (quoting Senate Report). Unless Congress intended that reviewing tribunals analyze assertions of agency interest, a balanced formula lies beyond our ken.

To make our point more concretely, we cite a few examples. In the paragraphs following the portions of Senator Hart's speech, *quoted supra* at 1450, the senator discussed the various techniques agencies had used to "thwart access to publicly valuable information in their files." Source Book at 451. He noted that "these amendments were necessary because the agencies have not made a good faith effort to comply with the act." *Id.* at 451–52. He cited "historical records" as the archetype of materials questionably withheld.[3] *Id.* at 452. Finally, Senator Hart seemed to assume that the protection of information was necessary not for its own sake, but to safeguard a source's identity and reduce administrative makework. *Id.; see also id.* at 462–63 (Sen. Ervin, introducing letter of

Sens. Mathias, Case, Javits, Baker, Kennedy, Muskie, Hart, and Ervin, and discussing adequate protection of confidentiality and administrative burden); *id.* at 456–57 (remarks of Sen. Hruska). Put another way, an agency's right to claim blanket protection applied only to ameliorate the administrative "overburden[]" of redacting documents. *Id.* at 452 (remarks of Sen. Hart). As Senator Hart concluded: "The fact that the agency can withhold information furnished by a confidential source relieves it of the burden of showing that disclosure would actually reveal the identity of the confidential source. . . ." *Id.; see also id.* at 450. Only if one understands Senator Hart as addressing the combined problem of confidentiality and administrative burden can one reconcile the remarks quoted by the majority and by us. With identity no longer an issue and with at least some information already available— the source, after all, has testified in public—Senator Hart's statements, taken fully and in context, are hardly supportive of a "no waiver" rule.

While more cryptic, the observations of Senator Kennedy, *supra* at 1450, should be read in the same vein. They followed closely on the heels of Senator Hart's remarks and appeared to adopt the sponsor's understanding. *See, e.g.,* Source Book at 459. President Ford's veto message also discussed the potential compromise to "confidentiality" in terms of the administrative burden imposed (an agency would have to deal with too many documents too quickly, and information which could compromise a source's identity might slip out). *Id.* at 484; *see also id.* at 461, 476 (Sen. Scott, characterizing presidential objections). Nowhere did the President mention the value of confidential information *per se.* And the comment of Senator Byrd, *supra* at 1450–51, though unambiguous, lacks any explanation as to why release of information,

---

2. The majority's suggestion that, in enacting the 1974 amendments Congress retreated from the views it had expressed in the 1965 Senate Report, quoted in *Mink, see, e.g., supra* at 1450, is, with respect, plainly wrong. In point of fact, the Senate Judiciary Committee explicitly reaffirmed those views in 1974, quoting the exact language earlier quoted by the *Mink* Court. *See*

Source Book at 159; *see also id.* at 349 (remarks of Sen. Kennedy); *id.* (Sen. Hart); *id.* at 264 (Rep. Fascell); *id.* at 413 (Rep. Reid).

3. Senator Hart used as an example FBI files on Bertoldt Brecht. Source Book at 452. The parallel to the materials at issue here is so striking as to be almost eerie.

once a source's identity had already been revealed, would "dry[ ]-up ... sources of information" to any appreciable extent. Source Book at 468. That unexplained assertion should not dwarf the more authoritative guides to legislative intent contained in the committee reports and elsewhere in the congressional annals.

Under these circumstances, there is no sufficient basis for applying the exemption's language expansively and pervasively. Rather, the Congress's clearly-articulated preference for generalized disclosure, fully adopted by the Court, should govern our interpretation. While we are constrained "to uphold a claimed 7(D) exemption so long as the statutory criteria are met," *Irons I*, 811 F.2d at 685, we ought to be more circumspect in looking for support in the language of those who, presumably, would most adamantly be opposed to withholding the documents at issue. It is the Act we must construe broadly, not the exemption (at least in the absence of a compelling rationale to do otherwise). We, therefore, read the exemption narrowly. This done, we are led inexorably to the conclusion that public testimony lifts the veil of secrecy to a greater extent than our colleagues are willing to acknowledge.

## II

The majority suggests that Exemption 7(D) is the FBI's to invoke, but fails to explain how we may understand when an agency waives the right of invocation. It makes abundant sense, from the perspective of both, or either, the agency or the source, to draw the margins of waiver consonant with the hypothetical scope of cross-examination, as we recommended in the panel opinion (now withdrawn) and continue to recommend here. *See infra* Part IV.

The assertion that "as a general matter, the more confidential information that appears in public (contrary to the true desire of the source), the harder it becomes for the law enforcement agency to recruit confidential sources," *supra* at 1454, lies at the core of the court's reasoning. The thesis deserves consideration. But, one must bear in mind that the proper temporal perspective is that of the agency looking for a *future* source and/or a source deciding whether to furnish confidential information to the agency *in the future.* The agency, after all, must be concerned with its ability to gain (or maintain) sources in the days to come; it possesses no time machine permitting it to go back into the past to get more sources. By the same token, while a tipster may fear betrayal of information already divulged, the information is no longer the source's to cradle. If fear can be thought to dry up sources, it can only operate as a desiccant *in futuro.*

All of us seem to agree that a primary concern is the preservation of anonymity. That, at least, is what the majority tells us is the government's view of things: "a rule of law that permits reputable historians to conduct historical research will permit, to the same extent, the most disreputable criminals to search out the identity and knowledge of those who inform against them." *Supra* at 1447.[4] But, by definition, public testimony will result in loss of anonymity. Put colloquially, the thugs will know that the source has ratted on them. That, for our hypothetical "most disreputable criminal," is probably enough. He can then obtain the source's identity and the content of publicly-revealed information (matters which the majority concedes cannot be kept in confidence when public testimony has occurred). Once that has happened, it strains credulity to think that the marginal increment of potential additional information one might gain under our suggested approach, *see infra* Part IV, information available by definition to the cross-examiner in the first place, could affect the source's safety or even his peace of mind. A source does not care about the aggregate of the information available in

---

**4.** At this juncture two things puzzle us. First, the FBI apparently wishes to take its stand on documents which do not raise the fearsome spectre of revenge. Second, there is something incongruous in the notion that the hypothetical "most disreputable criminal" would proceed in search of revenge by filing an FOIA request, thereby leaving a paper trail through which his own identity could be traced and exposed.

the world. From his viewpoint, real betrayal of confidentiality lies in the fact of testimony itself. To use Judge Breyer's phrase, *supra* at 1454, "fine spun risk-benefit calculations" are not in order.

Furthermore, Exemption 7(D) does not exist in a vacuum; it is but one plate in an array of armor. Even if 7(D) is construed more narrowly, so that some incremental information filters through, the informer (and in some instances the government) has other available bucklers. If information sought "interfere[s] with enforcement proceedings," it is shielded. 5 U.S.C. § 552(b)(7)(A). An unwarranted invasion of the privacy of the witness or others whose identity and knowledge might be sought is protected under 5 U.S.C. § 552(b)(7)(C).[5] *See, e.g., McCorstin v. U.S. Dep't of Labor,* 630 F.2d 242, 245 (5th Cir.1980) (per curiam), *cert. denied,* 450 U.S. 999, 101 S.Ct. 1705, 68 L.Ed.2d 201 (1981). There are similar safeguards pertaining to the "life or physical safety of any individual," 5 U.S.C. § 552(b)(7)(F), and the "disclos[ure of] investigative techniques and procedures." 5 U.S.C. § 552(b)(7)(E). These, and other, protections crafted by the Congress, collectively comprise a phalanx adequate to shelter the legitimate interests of the vulnerable without hyperextending the range and reach of Exemption 7(D).

For these reasons, we suggest that from the source's perspective the majority's limitation on disclosure adds little or nothing. We think the same is likely true from the agency's perspective. Granted, the majority's disposition of this point has the advantage of simplicity: it assumes that the greater the aggregate of disclosed information, the fewer the sources. *Supra* at 1454. Even putting aside our belief that such an analysis runs headfirst into the motivating spirit of the FOIA, we remain unconvinced. Agencies do not recruit sources in the aggregate, but one by one. The ability to recruit a source depends on the ability to convince him to come forward. If the po-

tential informant realizes that he might be required to testify, that fact, not the FOIA, will be the significant deterrent to his willingness to speak. As the majority itself acknowledges, the potential source must make a crude, not a fine spun, risk-benefit calculation.

There is one other integer in the equation. Our brethren admit that the act of testifying is presumptively "contrary" to a source's "true desire." *Supra* at 1454. But, think for a moment as to what is left unasked and unsaid. At whose behest does a source testify? Generally, it is the government which triggers the testimony. The recipient agency delivers the confidential information to, say, a prosecutor, precisely because it is agreeable that the identity of the source and the brunt of the information be revealed in a public forum to serve some governmental end. In that sense, the agency itself has decided that disclosure is worth the candle. At the same time, the agency is fully conscious of the scope of the information which might be revealed and can influence it to some degree. (Certainly, the government controls the scope of direct examination, and can thereby shape the scope of cross-examination somewhat.) It is fair, logical, and consistent with the method of the statute that the government's desire to enjoy the benefits of public testimony should define and delimit its right to invoke Exemption 7(D).

### III

Notwithstanding, the majority gives a number of reasons why waiver analysis is inapplicable. Whereas we agree that no express waiver has transpired in this situation, the claim that waiver may not legitimately be inferred from the source's conduct, *supra* at 1452–1453 is more problematic. Most notable of all, the majority is silent about whether a court can infer waiver from the government's conduct. We believe not only that a court can, but that it should. As Judge Breyer concedes, jurists

---

**5.** We find it close to impossible to believe that a court would deem a quintessential invasion of privacy such as the threat of revenge able to

penetrate the Exemption 7(C) plate. *See, e.g., Maroscia v. Levi,* 569 F.2d 1000, 1002 (7th Cir. 1977) (per curiam).

"use the word 'waiver' as a way of insisting that an individual forego protection which he says that he does *not* wish to give up but which he has *agreed* to give up in the past." *Supra* at 1453 (emphasis in original). Substitute the party who, in the majority's view, may legitimately invoke the prophylaxis of Exemption 7(D), *i.e.*, the government, and the analysis is precisely on point.

For much the same reason, consigning the "rule of completeness" to the scrapheap of irrelevancy, *supra* at 1453–1454, will not wash. While there may or may not be any "reason grounded in fairness for requiring a source who disclosed information during testimony to reveal, against his will (or to have the FBI reveal for him), information that he did not disclose in public," *supra* at 1454, there is a powerful reason grounded in fairness to require that a federal agency disgorge the information it was presumably willing to reveal in court (when it elected to have its source testify). Unless we have stumbled into the land of Oz, the government's power to invoke Exemption 7(D) cannot amount to holding its sovereign breath during an informer's cross-examination, hoping that little damaging testimony emerges; and, if hope be rewarded, then breathing a sigh of relief and scurrying back behind the shield of confidentiality. Such a cat-and-mouse view of the exemption makes mock of Congress's desire to open governmental activity to the scrutiny of the "informed citizenry" described by the *Robbins* Court, 437 U.S. at 242, 98 S.Ct. at 2327. And, insofar as the related information, once opened to public purview, might serve the ends of justice and openness, a chance to obtain the whole story is the exact aim of the FOIA.

## IV

We believe that proper construction of the Act, including Exemption 7(D), demands that we adhere to the same concept of waiver which infused our first opinion. *See Irons I*, 811 F.2d at 686 (waiver is "the purposeful relinquishment of an appreciated right" which "can fairly be deduced from conduct"). The act of testifying is always accompanied by at least the possibility of disclosing some quantum of information beyond the precise confines of the witness's direct answers. Cross-examiners, for instance, have reasonable latitude to inquire into related areas. *See, e.g.,* Fed.R.Evid. 611(b). Informants who take the stand must realize that, by so doing, they expose themselves to a range of questions which may go well beyond what the witness, or the examiner on direct, chooses to present during the case in chief. Follow-on questions may fairly delve into a queue of topics not originally discussed in detail, but made relevant to the inquiry by the juxtaposition of the witness's primary testimony in the context of the hearing as a whole. *See, e.g., United States v. Fortes*, 619 F.2d 108, 121 (1st Cir.1980) (having raised subjects on direct, witness "opened the door to a full and not just a selective discussion of these matters" on cross; opposing party entitled "to have [witness] complete the picture she had begun on direct"). And, just as the informer is on notice of his widened exposure, the government—practiced in such matters, and presumably astute—is equally on notice.

Implying a waiver of this genre and limited scope is in our view consistent not only with the goals of FOIA, but with familiar principles embedded in our jurisprudence. In a variety of settings, the act of testifying may constitute a waiver of privilege as to information which a person would otherwise be able to keep in the bosom of the lodge. Perhaps the most commonplace example is that testimony waives a witness's fifth amendment privilege against self-inculpation and invites cross-examination regarding topics "made relevant" by direct testimony. *United States v. Black*, 767 F.2d 1334, 1341 (9th Cir.), *cert. denied*, 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985). The scope of the consequent waiver is deemed to be "coextensive with the scope of relevant cross-examination." *Id.* *See also Brown v. United States*, 356 U.S. 148, 154–56, 78 S.Ct. 622, 626–27, 2 L.Ed.2d 589 (1958) (similar). The rendition of testimony which trenches upon the attorney-client privilege is viewed in a similar fashion. In this context, as the District of

Columbia Circuit has declared, "[w]hen a party reveals part of a privileged communication ..., it waives the privilege as to all communications relating to the same subject matter." *In re Sealed Case,* 676 F.2d 793, 817–18 (D.C.Cir.1982); *see also United States v. Jones,* 696 F.2d 1069, 1072 (4th Cir.1982); *von Bulow v. von Bulow,* 114 F.R.D. 71, 79 (S.D.N.Y.1987). There is, of course, a basic notion of equity which undergirds such rules: "a privileged party cannot fairly be permitted to disclose as much as he pleases and then to withhold the remainder...." *Greater Newburyport Clamshell Alliance v. Public Service Co.,* 838 F.2d 13, 19 (1st Cir.1988).

Nor do we perceive any compelling reason for allowing a government informer who has actually testified to limit the scope of his revelations to the precise questions asked and answered, or to permit the FBI, under the aegis of Exemption 7(D), to withhold information directly relevant to the informant's trial testimony. Congress, we think, did not intend to cast so huge and enduring a veil of impenetrability over confidences contained in law enforcement files. That is particularly true where, as here, disclosure will further the FOIA's cardinal objectives. Scholarly research tends to take place at the margin of knowledge. The hypothetical scope of cross-examination may well reveal information of value to those citizens superintending the government, where that same marginal information, obtained at some risk, would mean little if anything to a revenge-seeker. That balanced calculation, embodied in a rule, is exactly what the Congress desired. *See, e.g., Mink,* 410 U.S. at 80, 93 S.Ct. at 832.

The caselaw, while admittedly tenebrous, fails to support either the majority's reasoning or its result. Those cases in which "courts said that even though the relevant information *already is public,* the FBI *nonetheless* need not disclose it because the source has *not* 'waived' the exemption," *supra* at 1454 (emphasis in original),

do not adopt the majority's outlook. If, as our brothers contend, we must look to the government, not the source, for waiver, then these cases suggest either that the majority's perspective is incorrect or, at least, irrelevant in terms of the question which confronts us.[6]

*Scherer v. Kelley,* 584 F.2d 170, 176 n. 7 (7th Cir.1978), *cert. denied,* 440 U.S. 964, 99 S.Ct. 1511, 59 L.Ed.2d 778 (1979), quoted *supra* at 1454–55, is clearly aimed at a much wider target than is presented here. In *Scherer,* the Seventh Circuit rejected the view that "all information offered" regarding "every transcription made by an investigative agent" should be disclosed. *Id.* We agree. But, the *Scherer* panel nowhere addressed possible intermediate solutions. In that sense, *Scherer* and the "no-waiver" cases like it, *e.g., Kiraly v. FBI,* 728 F.2d 273, 279–80 (6th Cir.1984), are the flip side of the line of "full waiver" cases holding that an informant's public testimony renders the totality of the information supplied by that informant disclosable. *See, e.g., Van Bourg v. NLRB,* 751 F.2d 982, 986 (9th Cir.1985) (persons submitting affidavits "have no reasonable expectation of confidentiality and should expect their names and testimony to be revealed if the investigation results in a formal hearing"); *United Technology Corp. v. NLRB,* 777 F.2d 90, 94 (2d Cir.1985); *Poss v. NLRB,* 565 F.2d 654, 658 (10th Cir.1977). We continue to believe that there is a middle road between these two extremes—and that ample reason exists to take it.

Accordingly, we conclude that the Smith Act informants, by testifying, waived the privilege of confidentiality under Exemption 7(D) with respect to all information relevant to the testimony which they gave. As with the fifth amendment, the contours of the consequent waiver should be drawn coterminous with the hypothetical scope of relevant cross-examination. *See Black,* 767 F.2d at 1341. We believe that reading

---

6. The majority says that *Ingle v. Dep't of Justice,* 698 F.2d 259 (6th Cir.1983), teaches "that the FBI cannot 'waive' the protection the exemption gives the source." *Supra* at 1454. On that reading, the majority's perspective must be incorrect, for *Ingle* places waiver strictly in the source's hands. 698 F.2d at 269 ("it is properly the right of those sources themselves to waive any protection afforded by cooperating with the FBI").

the exemption in this commonsense fashion treats fairly with the government, the informants, and the requestors. Moreover, such a recension is comfortably compatible with the teleology of the FOIA.

We are mindful that our brethren suggest, in a hypothetical example and by argument, that our proposed rule would be unworkable. Their tone likewise implies the practical superiority of the rule which they espouse. But, neither theory nor experience lend credence to their claims. As to the hypothetical example, *supra* at 1451, it is perfectly clear that Congress never intended FOIA's exemptions to function in so crabbed a manner. Rather, Congress intended other exemptions—for example, 7(C) (privacy) and 7(F) (endangerment)—to cover the fictitious problem contrived by our colleagues. *See, e.g.,* Source Book at 184, 293–94, 298–99, 313, 333, 338, 469, 476, 519, 523. And as to practicality, it was Senator Hart who noted that these were "determination[s] courts make all the time...." *Id.* at 351. In this instance, experience has proven out the legislative forecast. *See, e.g., White v. IRS,* 707 F.2d 897, 901–02 (6th Cir.1983) (Exemption 7(C) shields identity of those willing to provide statements); *Alirez v. NLRB,* 676 F.2d 423, 426–28 (10th Cir.1982) (Exemption 7(C) protects co-worker statements); *Bast v. U.S. Dep't of Justice,* 665 F.2d 1251, 1254–56 (D.C.Cir.1981) (extending Exemption 7(C) to protect third parties); *Fund for Constitutional Government v. National Archives and Records Service,* 656 F.2d 856, 863–66 (D.C.Cir.1981) (utilizing Exemption 7(C) for benefit of unindicted Watergate figures).

Then, too, there is no reason to think that the circumscribed disclosure which we would permit has the potential of interfering with the government's (admittedly significant) interest in safeguarding informant programs. In *Irons I,* we made manifest our belief that Exemption 7(D) should not be construed in such a way as would "handcuff[ ] ... [the government's] performance of important law enforcement functions" or so as to force the govern-

ment "to choose between establishing a network of confidential sources or formulating a successful prosecutorial strategy." 811 F.2d at 689. We remain faithful to those sentiments. By procuring informant testimony, however, the government makes a strategic decision: to chance forfeiting persons' anonymity and much of the confidential information possessed by them in order to gain the benefit of their evidence. By actually testifying, the informants themselves have made a similar choice. In stepping from the shadows into the limelight, they surrender their anonymity and accept the possibility of divulgement of all *relevant* information they supplied to the government.

The scope of disclosure which we believe the FOIA requires neither places an untoward burden upon law enforcement—indeed, it places no greater burden than does the scheme endorsed by the majority—nor threatens the "needless drying up of sources [which would be] at odds with the purpose of the exemption." *Shaw v. FBI,* 749 F.2d 58, 62 (D.C.Cir.1984). In criminal matters, after all, the government has lived with a substantially similar protocol, the Jencks Act, which provides in pertinent part:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement ... of the witness in the possession of the United States *which relates to the subject matter as to which the witness has testified.*

18 U.S.C. § 3500(b) (emphasis supplied).[7] We have held that, in determining whether material is disclosable under the Jencks Act, "the key question is whether the information contained in the statements 'relate generally to the events and activities testified to' by the witness." *United States v. Ferreira,* 625 F.2d 1030, 1034 (1st Cir.1980) (citation omitted). An equivalent inquiry should be made when deciding whether information has lost the protection of Exemption 7(D) following an informant's actual

---

**7.** The term "statement" as used in this context means "a written statement made by said wit-
ness and signed or otherwise adopted or approved by him." 18 U.S.C. § 3500(e)(1).

testimony. The relative ease with which courts have been able to apply the *Jencks* rule, and rules like it, belies the majority's stilted view of cross-examination, *supra* at 1455–56, and its thumb-on-the-scale weighing of situational practicalities.

Lastly, we do not expect that the limited disclosure we envision would unduly dampen witnesses' ardor for testifying. A witness would be at no greater risk of disgorging information than he was when he offered his public testimony. Thus, the "delicate balance achieved by the [FOIA] between the interest of a private citizen and that of an investigative agency," *Scherer*, 584 F.2d at 176 n. 7, would be undisturbed.

V

We are satisfied that the giving of actual testimony by a confidential informant constitutes a waiver as to the subject matter of his or her testimony, and all other information related thereto, measured by the hypothetical scope of relevant cross-examination. The salutary purposes which the FOIA was devised to serve demand no less. To the extent that our brethren take a more parochial view of what Congress purposed, we respectfully dissent. Although we agree that the district court's turnover order was significantly overbroad and must be vacated, we would direct the entry, in its place, of an order consistent with this opinion.

BOWNES, Circuit Judge (dissenting).

I endorse fully my brother's compelling analysis and point-by-point refutation of the majority opinion. I add a few comments of my own. What this case primarily concerns is not the protection of witnesses but protecting a government agency from public embarrassment. The record of what happened during the witch hunts of the 1950s should be made available to historians. That is one of the purposes of the Freedom of Information Act. Under the rubric of "security" and "protecting government sources," the Act is slowly be-

ing strangled to death. The majority decision tightens the garrotte one more notch.